# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUTHENTIC BRANDS GROUP, LLC, ABG-SI LLC, and ABG INTERMEDIATE HOLDINGS 2 LLC, | Case No. 1:24-cv-02432 |
| Plaintiffs, | |
| v. | |
| THE ARENA GROUP HOLDINGS, INC. and MANOJ BHARGAVA, | |
| Defendants. | |

| |
|---|
| THE ARENA GROUP HOLDINGS, INC., |
| Counter & Third-Party Plaintiff, |
| v. |
| AUTHENTIC BRANDS GROUP, LLC, ABG-SI LLC, and ABG INTERMEDIATE HOLDINGS 2 LLC, |
| Counter Defendants, |
| and |
| SPORTORITY INC., d/b/a MINUTE MEDIA, |
| Third-Party Defendant. |

Deleted: MINUTE MEDIA, INC.

**THE ARENA GROUP HOLDINGS, INC.'S FIRST AMENDED
COUNTERCLAIMS, THIRD-PARTY COMPLAINT AND ANSWER**

Defendant, Counterclaimant and Third-Party Plaintiff The Arena Group Holdings, Inc.

("Arena") hereby answers the Complaint of Authentic Brands Group, LLC ("Authentic Brands"),

ABG-SI LLC ("ABG-SI"), and ABG Intermediate Holdings 2 LLC ("ABG-IH2," together with

Authentic Brands and "ABG-SI", "ABG", "Plaintiffs" or "Counter Defendants"), asserts counterclaims against Counterclaim Defendants ABG, and asserts third-party claims against Sportority Inc., d/b/a Minute Media ("Minute" or "Third Party Defendant"), stating as follows:

| | Deleted: Minute Media, Inc. |

### PRELIMINARY STATEMENT TO COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1.     ABG is a monopolistic and predatory licensing company. Consistent with its well-documented predatory business practices, ABG has squeezed Arena out of its role operating Sports Illustrated through oppressive and illegal business tactics. Now, ABG seeks to saddle Arena with an exorbitant and punitive termination fee while at the same time conspiring with Arena's competitor, Minute, to steal the crown jewel of Arena's business—the proprietary code technology and trade secrets comprising the valuable internet platform Arena developed at significant expense. Arena has been damaged by ABG's and Minute's misconduct by at least $200,000,000.

2.     In an effort to deflect from its own misconduct, ABG along with its Board members who represent leading financial institutions such as CVC Capital Partners ("CVC") and BlackRock, filed a sensationalized Complaint, lobbing and publicizing salacious and defamatory allegations against Arena and Manoj Bhargava ("Bhargava"), the sole Manager of Arena's largest shareholder, hoping to frame the narrative before the truth about its unfair business tactics and brazen theft surfaced.

3.     Arena is just the latest licensee to fall victim to ABG's extensive and public history of strip-mining its license partners, imposing steep guaranteed royalties and termination fees that award ABG a windfall, and plunging its contractual counterparties into near-insolvency before abandoning them for new targets.[1] To wit: in March 2024, 888 Holdings announced that, much

---

[1]     *See e.g., SLS Brands, LLC v. Authentic Brands Grp.*, LLC, No. 19-CV-8115 (JPO), 2021 WL 396641 (S.D.N.Y. Feb. 4, 2021) (allegations that ABG breached exclusivity provisions in licensing agreements and sought to terminate existing agreements when presented with a new opportunity). An article exploring former ABG licensee

like Arena, it was forced to terminate its unprofitable joint venture with ABG, triggering an oppressive $50 million termination fee.[2]

4.    ABG's unfounded and defamatory allegations have no connection whatsoever to the claims ABG asserted in its Complaint, and have little connection to the truth. In reality, this action is about ABG enlisting businessmen from top tier investment firms (including CVC, BlackRock and others) to help steal from Arena, conspiring with its new licensee (Minute) to orchestrate a multi-step corporate heist against Arena. *First*, ABG made it economically impossible for Arena to operate Sports Illustrated, slowly but steadily turning the financial screws on Arena until it was forced to make the necessary choice to pay its employees instead of paying a quarterly license fee owed to ABG. *Second*, after promising to work with Arena in good faith towards a new, commercially expedient arrangement, ABG abruptly sent a termination letter demanding a staggering $45 million penalty payment. *Third*, even after invoking a termination fee, ABG continued to leverage the reputations of CVC and BlackRock to lull Arena with false promises of good faith renegotiations, all while working secretly with Minute to prepare to transfer the Sports Illustrated license to Minute and, for good measure, steal Arena's valuable trade secrets in the process – inflicting tens of millions of dollars of damages on Arena in the process.

5.    ABG accomplished this sophisticated theft while hiding behind the BlackRock and CVC code of ethics, which, respectively, purport to "conduct [] business activities in the highest

---

Global Brand Group North America's ("GBG") bankruptcy describes GBG's miserable experience under its ABG license agreement: "Historically, the majority of royalties paid by the debtors were the result of guaranteed minimum royalties required under that certain master license agreement," and "the guaranteed minimum royalties placed a significant strain on the Debtors' balance sheet." *CASE SUMMARY: GBG USA Debtors to Run Sale Process With Stalking Horse for Aquatalia Assets, Also Marketing Other Portfolio Brands*, Reorg (July 29, 2021), https://reorg.com/gbg-usa-bankruptcy/.

[2]    Radosav Milutinovic, *888 Holdings Terminates Sports Illustrated Deal; to Start Withdrawing from US Market*, World Casino News (Mar. 7, 2024), https://news.worldcasinodirectory.com/888-holdings-terminates-the-sports-illustrated-deal-to-start-withdrawing-from-the-us-market-112474.

ethical and professional manner"[3] and "maintain the highest level of integrity and strong ethics in the conduct of its business."[4] ABG's actions throughout these events fell legions below these standards.

6.      ABG's accomplice in this scheme, Minute, is an Arena competitor, founded in Israel with headquarters in London. Minute exploited Arena's strained financial condition and trust in its licensor counterparty (ABG) to improperly access Arena's computer systems in violation of their Terms of Service, steal and replicate its website and proprietary code, and complete the corporate theft by using Arena's former employees as conduits to obtain valuable confidential information that allowed Minute to poach Arena's publisher relationships. Minute's participation in the conspiracy against Arena was financed by an investment from ABG that provided Minute with enough capital to obtain the Sports Illustrated license.[5]

7.      Arena, not ABG, is the true victim in this case. While ABG may have been entitled to terminate Arena's Sports Illustrated license, it was not permitted to conspire with a new licensee to steal Arena's proprietary local publisher network business and its carefully architected website code, severely damaging Arena in the process. ABG's and Minute's actions have cost Arena millions, for which it intends to hold them accountable. And ABG's cynical demand for a $45 million termination fee will be exposed for what it is: a shakedown attempt to collect upon an unlawful and unenforceable penalty clause.

---

[3]     *Code of Business Conduct and Ethics*, BLACKROCK (Dec. 7, 2021), https://s24.q4cdn.com/856567660/files/doc_downloads/governance_documents/2021/12/Code-of-Business-Conduct-and-Ethics-Dec-2021-v5.5.pdf.

[4]     *Code of Ethics*, CVC CAPITAL PARTNERS PLC (Apr. 30, 2024), https://www.cvc.com/media/3b5pn2qd/24-k-code-of-ethics.pdf.

[5]     *Sports Illustrated Publishing Rights Secured by Minute Media, after Mass Layoff Under Previous Partner*, Todd Spangler, Variety (Mar. 18, 2024), https://variety.com/2024/digital/news/sports-illustrated-publishing-rights-minute-media-1235944489/

4

**PARTIES, JURISDICTION, AND VENUE**

8.      Defendant, Counterclaimant and Third-Party Plaintiff Arena is a Delaware Corporation with its principal place of business at 200 Vesey St, 24th Floor, New York, New York 10281.

9.      According to the ABG Complaint, Plaintiff and Counterclaim Defendant "Authentic Brands Group, LLC ("Authentic Brands") is a Delaware limited liability company with its principal place of business in New York, New York." ABG Complaint ¶ 21.

10.     According to the ABG Complaint, Plaintiff and Counterclaim Defendant "ABG Intermediate Holdings 2 LLC ("ABG-IH2") is a Delaware limited liability company with its principal place of business in New York, New York. ABG-IH2's sole member is ABG Intermediate Holdings 1 LLC ("ABG-IH1"), also a Delaware limited liability company with its principal place of business in New York, New York, and ABG-IH1's sole member is Authentic Brands." *Id.* ¶ 22.

11.     According to the ABG Complaint, Plaintiff and Counterclaim Defendant "ABG-SI LLC ("ABG-SI") is a Delaware limited liability company with its principal place of business in New York, New York. ABG-SI's sole member is ABG-IH2, and ABG-SI is the counterparty and licensor to the licensing agreement at issue." *Id.* ¶ 23.

12.     Upon information and belief, Third-Party Defendant Minute is a Delaware corporation registered to do business in New York. Upon further information and belief, Minute has employees in and regularly transacts business in New York.

13.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1331 and 1367.

**Deleted:** Cayman Islands

**Deleted:** company that has an office at 55 Avenue of the Americas, 10013, New York,

14.     This Court has personal jurisdiction over ABG and Minute by virtue of their transacting, doing, and soliciting business in this District, committing tortious acts in this District, and because a substantial part of the relevant events occurred in this District.

## FACTUAL BACKGROUND

### A. Arena is a Technology Platform Company

15.     Arena's predecessor, TheMaven, Inc. ("Maven"), was originally incorporated in Delaware as Integrated Surgical Systems, Inc. ("Integrated") in 1990. Integrated became Maven on December 2, 2016, following a share exchange and subsequent recapitalization. Maven then legally changed its name and rebranded itself as Arena in September 2021.

16.     Arena is a technology company that empowers media brands, publishers, and creators to publish and monetize their content through its proprietary technology platform, a sophisticated configuration of code painstakingly developed by Arena to render content so as to maximize user engagement and advertising revenue.

17.     Since its inception, Arena has invested significant time, effort, and resources to develop the technology behind its platform, including by acquiring smaller digital media technology companies such as HubPages, Inc. and Say Media, Inc., acquired in January 2018 and August 2018, respectively.

18.     Arena also owns and operates well-known media brands such as TheStreet, Parade, Men's Journal, and Athlon Sports and hosts those entities on its proprietary web platform. Until on or about March 18, 2024, Arena licensed and operated the Sports Illustrated print, web-based, and mobile media platforms.

19.     Arena's core business is powered by its code and its publisher and advertiser relationships. The bedrock of Arena's code is its proprietary Content Management System

6

("CMS"). Arena's CMS is comprised of several components, each of which plays an essential role in enabling Arena to generate, display, organize, and monetize content.

20.     The publishing function of the CMS operates via a proprietary platform called Tempest. Tempest analyzes Google analytics regarding search history and internet trends to provide publishers with specialized guidance on what to write about to drive traffic to their content hosted on Arena's sites. If a particular topic is popular on the internet, *i.e.*, a large quantity of internet users is searching for or producing content about it, Tempest's proprietary analytics will identify that topic and provide publishers with guidance about how to craft content that is likely to generate clicks and views.

21.     Generating traffic to its platform is crucial to Arena's bottom line. Arena derives revenue via advertisements adjacent to, and embedded within, hosted content. Generally speaking, Arena derives revenue from digital advertisers who pay Arena each time a user views their advertisement, a model referred to as "pay-per-impression." Content that generates more traffic will garner higher digital advertising revenues for platforms such as Arena, and Arena has developed market-leading proprietary analytics for generating more impressions for the content it hosts.

22.     The user experience function of the CMS is referred to as Phoenix. Through Cascading Style Sheets ("CSS") and "boot scripts," which are portions of JavaScript source code that perform specific tasks such as image-rendering and site-navigation mechanics, Phoenix creates the  engaging user experience of Arena's platform and the content hosted on it. The user experience of a website is at least as important as the content on the site. Users are more likely to engage with content on sites that are pleasing and elegant and that they are comfortable navigating.

7

23.    A major component of Arena's appeal to both content publishers and advertisers is its platform, *i.e.*, Arena's proprietary robust system and tools for selecting, arranging and displaying content and ads, a method powered by its CMS, which, as explained above, identifies the best content to produce and promote and enables Arena's creatives to render that content in a specific and user-engaging way, generating increased traffic and thereby producing more clicks and impressions.

24.    For publishers and creatives, Arena's proprietary platform allows them to focus on what they do best, writing and creating content, while Arena provides industry-leading tools to host, promote, and monetize that content.

25.    Arena has also developed strong relationships with advertisers, allowing Arena to negotiate at scale and secure advantageous terms which small and independent publishers cannot achieve on their own.

26.    Through its content, the prestige of its brand portfolio and the efficacy of its proprietary hosting platform, Arena has consistently maintained impressive ComScore rankings. ComScore's audience measurement tools are a valuable resource for advertisers. By analyzing ComScore rankings, advertisers can identify websites with high traffic volumes and strong audience engagement metrics, indicating a good fit for their targeted campaigns. High ComScore rankings are integral to Arena's ability to achieve favorable deals with advertisers, as advertisers will pay more to a publisher who can demonstrate that its content achieves high traffic. ComScore rankings can suffer due to interruptions such as what occurred here.

27.    For these reasons, the theft of Arena's CMS and relationships by ABG and Minute threatens to significantly disrupt Arena's competitive edge.

8

**B.  ABG Acquired the Sports Illustrated Brand and Immediately Licensed it to Arena**

28.     ABG is a holding company that, among other things, buys, licenses, and sells underperforming brands, predominantly in the sports and entertainment industry. ABG does not typically operate or monetize brands on its own, but instead contracts with third-party operators such as Arena to monetize digital content.

29.     Sports Illustrated was founded as an American sports magazine in 1954.[6] While older generations may have looked to the cover of Sports Illustrated for the definitive images of sports and cultural heroes of their time, today's athletes and fans turn on their iPhones and laptops to stay up to date on their favorite sports teams and sports news of national interest.

30.     On or about May 27, 2019, ABG purchased the Sports Illustrated trademarks and related intellectual property (the "Sports Illustrated Portfolio") from Meredith Corporation ("Meredith") for $110 million.[7]

31.     Even before ABG closed on its acquisition of the Sports Illustrated Portfolio, ABG and Arena (then Maven) began discussing an arrangement that would grant Arena the exclusive right to operate the Sports Illustrated digital and print assets in exchange for royalty payments to ABG.

32.     Negotiations with ABG were led by former Maven/Arena executives James Heckman ("Heckman") and Ross Levinsohn ("Levinsohn") and progressed quickly. Arena and ABG entered into a licensing agreement on June 14, 2019 (the "License Agreement"), mere weeks after ABG acquired the Sports Illustrated Portfolio.

---

[6]     Andrew Bucholtz, *How did Sports Illustrated get here? A full timeline*, AWFUL ANNOUNCING (Mar. 21, 2024), https://awfulannouncing.com/warner-bros-discovery/how-did-sports-illustrated-get-here-timeline.html.

[7]     *Meredith Corporation Announces Sale of Sports Illustrated to ABG for $110 million*, DOTDASH MEREDITH (May 27, 2019), https://dotdashmeredith.mediaroom.com/2019-05-27-Meredith-Corporation-Announces-Sale-of-Sports-Illustrated-to-ABG-for-110-million.

9

33.     In the months leading up to the October 2019 commencement of the License Agreement, Arena invested heavily to upgrade its platform, in terms of both technology and human capital, to ensure the launch of the Sports Illustrated website, SI.com, would be seamless.

34.     Under the License Agreement, Arena was required to pay ABG guaranteed royalty payments of $15 million each year, with the first three years of guaranteed annual royalty payments, or $45 million, due upfront. *See* License Agreement § 7(a)(i) & (ii).

35.     As explained above, the creation and development of Arena's platform significantly predated the License Agreement. Through the License Agreement, Arena expected to increase the value of its platform business by leveraging the notoriety of the Sport Illustrated Trademark and related URLs to attract larger audiences and strike more advantageous deals with advertisers, thereby increasing its revenue.

**C.  Arena Leveraged its Proprietary Platform to Build FanNation**

36.     Arena's ability to direct traffic to its digital content and monetize impressions enabled it to profitably drive SI.com traffic to an existing Arena platform of local sports publishers. Arena dubbed that section of the SI.com website "FanNation".

37.     The content distribution strategy that Arena developed and labeled with the FanNation name and logo was a media strategy Arena's former CEO, Heckman, had employed at various media companies for decades under different names—*e.g.*, Scout Media and Rivals— before contributing that business model to Arena upon its founding. Heckman built Arena around the concept that a technology platform could monetize and support smaller or more regional publishers as well as national and international coverage, benefitting both Arena and local/regional publishers.

10

38.     The business case for the concept stems from the idea that sports journalism is "tribal." Readers seek content related to specific teams or geographic areas, while also remaining interested in stories of a national or broader interest. For example, fans of the New York Giants often seek team-specific coverage first, but also may be interested in sports news of national concern. Arena's proprietary platform combines both categories of fan interest for "one stop viewing."

39.     To bolster this business concept, Arena expended significant time, energy and money sourcing, recruiting and developing a network of independent third-party publisher partners (the "Publisher Partners"), local sportswriters and content creators who entered into confidential agreements directly with Arena to publish their content on Arena's platform via unique landing pages with geographic or team descriptors, referred to as "channels." For example, Arena recruited and entered into a partnership agreement with a Publisher Partner limited liability company that it granted the exclusive right to publish content on its platform related to the Miami Marlins MLB team, with a "channel" entitled "Inside the Marlins."

40.     Arena carefully sourced and recruited its Publisher Partners, offering significant monetary incentive at its own expense. Arena also invested significant time and resources training Publisher Partners to create content in a manner that increased search engine optimization and generated maximum views. Some of this know-how was developed using Arena's proprietary Tempest application.

41.     Arena leveraged its proprietary local publisher network for the benefit of the SI.com business during the term of the License Agreement. Pursuant to the License Agreement, websites were labeled with SI Trademarks (i.e., the trademarks identified on Schedule A of the License Agreement) and included SI.com in their URLs. *See* License Agreement § 1(n). For example, the

"Inside the Marlins" content was hosted at the URL Si.com/mlb/marlins. Arena called the aggregation of some of these channels "FanNation" .

42.    Through Arena's substantial and painstaking efforts and investment, the FanNation-labeled section of its platform—*i.e.*, Arena's network of local Publisher Partners and collection of channels monetizing their content—became the crown jewel of Arena's business.

**D.  The Sports Illustrated Print Business Severely Strained Arena's Ability to Profit from the SI Partnership**

43.    While Arena was able to successfully monetize the SI.com digital business (including the FanNation-labeled sub-sites), it struggled to achieve overall profitability under the License Agreement. ABG's ever-worsening commercially unreasonable licensing requirements and insistence that Arena continue to issue Sports Illustrated print magazines—despite an ever-shrinking subscriber base and ever-increasing costs—crippled Arena's ability to generate any profit from licensing the Sport Illustrated Portfolio. ABG's insistence on high-cost parameters for the SI magazines only exacerbated the problem. The Sports Illustrated magazine generated significant losses from 2020 through 2024. ABG was fully aware of the albatross that was the SI magazine, but nevertheless continued to extract $15 million in annual guaranteed royalty payments from Arena. *See* License Agreement § 7(a)(i).

44.    The Sports Illustrated print business' drain on Arena was only part of the issue. Arena's efforts to adapt, modernize and supplement the Sports Illustrated business were repeatedly thwarted by ABG's commercially unreasonable and selfish conduct. Arena's proposals to augment the SI Licensed Business were often vetoed by ABG, discretion which ABG had under the express terms of the License Agreement but which it applied in bad faith and so as to deprive Arena of its reasonable commercial expectations. And even in the rare instances where ABG permitted Arena

to move forward with a proposed new or alternative strategy, ABG insisted on expensive concessions from Arena that drastically undercut or eviscerated Arena's ability to profit from it.

45.     Upon information and belief, ABG knowingly and selfishly sought to saddle Arena with ever-increasing costs to produce the Sports Illustrated print magazines and  serve an antiquated, ever-shrinking market while being prevented from doing what it does best: expand avenues and means to further monetize Sports Illustrated businesses online.

**E. Bhargava took Control of Arena and Quickly Attempted to Right the Ship by Negotiating an Equitable Licensing Agreement**

46.     In August 2023, Simplify Inventions, LLC ("Simplify"), by its Manager, Bhargava—the founder of 5-hour ENERGY®, an experienced businessman, and philanthropist (having pledged 99% of his net worth to charitable causes)—signed a Letter of Intent to acquire 65% of the common stock of Arena and to merge Simplify's media company, Bridge Media Networks, LLC, with Arena, which intent was memorialized in a Business Combination Agreement among the parties in early November 2023.

47.     In early December 2023, Simplify acquired approximately 44% of the common stock of Arena, making Simplify the largest shareholder of Arena. On December 11, 2023, Bhargava was appointed as interim CEO of Arena by its Board of Directors. Bhargava quickly realized Arena was operating at a significant loss and had serious operational issues.

48.     On or about December 14, 2023, Bhargava met with Dan Dienst ("Dienst"), Vice Chairman of ABG, to discuss the increasing financial strain that ABG's conduct was putting on Arena. During the meeting, Bhargava presented Dienst with Arena's bleak cashflow projections and explained that Arena could not afford its upcoming $3.75 million quarterly royalty payment due to ABG in January 2024 (the "Q124 Quarterly Payment") while also paying its employees.

49.     On or about January 3, 2024, Bhargava met with Dienst and Jamie Salter ("Salter"), ABG Founder, Chairman and Chief Executive Officer, to discuss the increasingly bleak state of affairs for the SI businesses. Bhargava again informed ABG that Arena was unable to both pay the Q124 Quarterly Payment and also meet its payroll obligations.

50.     Rather than offer to work with Arena on the Q124 Quarterly Payment, as any reasonable license partner who cared about the health of Sports Illustrated would have done, Salter responded by suggesting that ABG might shop the license to other third parties if Arena could not keep the license fees current, and would be involving ABG's Board of Directors in any decisions with Arena.

51.     With ABG refusing to budge in the negotiations, Arena was forced to make the difficult but necessary decision to use its limited funds to pay its employees rather than ABG.

52.     While many license counterparties would have seen Arena's struggles as a sign that the business terms needed to be revised to address (among other things) the significant financial strain caused by the Sports Illustrated print magazines, ABG saw an opportunity to further enrich itself at its partner's expense. On January 3, 2024, Authentic Brands sent Arena a Notice of Breach, threatening that Arena had 10 days to cure its missed quarterly payment or else ABG would terminate the License Agreement and seek to collect a $45M termination payment—a staggering sum that is completely disproportionate to any losses ABG could possibly experience (and ultimately, there were no such losses), and which ABG knew from the parties' extensive discussions it had no hope of collecting.

53.     On January 18, 2024, ABG sent Arena a written Notice of Termination of the License Agreement.

14

**F.  While ABG was Negotiating with Arena, it was Simultaneously Conspiring with a Foreign Competitor, Minute, to Steal Arena's Business**

54.    Unbeknownst to Arena, ABG was already working on shopping the license to other potential operators but sought to ensure that the transition would be seamless. In order to consummate this scheme, ABG first needed to buy itself time to find a new licensee partner. To that end, ABG deceived Arena by promising to work with Arena in good faith to renegotiate Arena's license so as to allow Arena to continue to operate Sports Illustrated.

55.    ABG leveraged the reputation of its Board members in aid of this gambit. On January 4, 2024, Chris Baldwin, a CVC Managing Director and ABG Board member, reached out to Bhargava and represented himself as the lead ABG director handling negotiations with Arena. Bhargava trusted Baldwin's intentions and the CVC cloak he wore, believing that ABG would negotiate in good faith to find a solution that would allow Arena to continue running the Sports Illustrated Portfolio in a manner that was profitable for both companies.

56.    ABG continued to play both sides: stringing Arena along with reassurances while turning the screws and secretly conspiring with Minute to become its next Sports Illustrated licensee. ABG's January 18, 2024 Notice of Termination, sent while the parties remained in negotiations, demanded a $45 million termination fee. That notice forced Arena to institute layoffs of SI personnel, a measure Arena hoped would only be temporary.

57.    The next day after its termination notice to Arena, Salter bragged to the media that he told Bhargava to, 'f--- off,' "If a company doesn't pay me, I breach," and boasted that he could "sell the license to other interested parties".[8] Bhargava, however, discounted Salter's public bluster

---

[8]        Ben Strauss, *Layoffs imperil Sports Illustrated as owner, publisher battle over money*, THE WASH. POST (Jan. 19, 2024), https://www.washingtonpost.com/sports/2024/01/19/sports-illustrated-layoffs/.

in light of their private conversations where Salter and ABG had reassured Bhargava that the parties would work together to reach agreement on revised license terms.

58.    Meanwhile, Baldwin continued to leverage the CVC brand to bait Bhargava into believing that Arena and ABG could come to terms on a revised License Agreement that would allow Arena to continue operating Sports Illustrated.

59.    At the same time, BlackRock, which, upon information and belief is ABG's largest shareholder, was financing a deal that would allow Minute to acquire an asset called STN Video, a digital video platform that provides content publishers with access to a library of sports and other videos (*e.g.* game highlights) and tools to monetize content.[9] The acquisition enabled Minute to compete with Arena for viewers and content creator partners.[10]

60.    Asaf Peled, CEO and Founder of Minute, acknowledged in a January 30, 2024 interview with Axios that "Minute Media could acquire publishing rights to SI."[11]

61.    Arena, unaware of the plot to steal its business, continued to negotiate in good faith with ABG and continued to operate the SI businesses. On or about February 14, 2024, Bhargava again met Salter and Dienst, during which meeting Salter made a proposal for the revised License Agreement. Arena provided a summary of Salter's proposal back to ABG, but ABG quickly changed its mind and revoked Salter's proposal.

---

[9]    BlackRock was ABG's largest shareholder as of November 2021. *Authentic Brands Group Shelves IPO Plans*, PYMNTS (Nov. 22, 2021), https://www.pymnts.com/news/retail/2021/authentic-brands-group-shelves-ipo-plans/.

[10]    Minute is now leveraging the FTN assets on the SI Portfolio and the network of local Publisher Partners Minute stole from Arena, formerly referred to as FanNation, which Minute has rebranded as "On SI". *See* Mark Stenberg, *Minute Media Refines Portfolio to Rebuild Sports Illustrated,* ADWEEK (May 23, 2024), https://www.adweek.com/media/sports-illustrateds-minute-media-portfolio-shifts/#.

[11]    Sara Fischer, *Minute Media valued at over $1B after new round of funding*, AXIOS (Jan. 30, 2024), https://www.axios.com/2024/01/30/minute-media-valued-over-1b-new-funding.

62.     The discussions between Baldwin and Bhargava continued in earnest for several more weeks. On or about March 5, 2024, Baldwin texted Bhargava "good to speak yesterday. Your points are very clear. We are working some details with your team and plan to discuss our plans with you by mid next week."

**G.  While Arena Was Distracted with the Negotiation, ABG and Minute Enacted a Multi-stage Plan to steal Arena's Code and Websites**

63.     Unbeknownst to Arena, ABG's promise of good faith negotiations was a ruse. Baldwin was distracting Bhargava while ABG planned to transfer the Sports Illustrated license to a competitor of Arena, the Israeli entity called Minute. At the same time ABG was purporting to discuss revised license terms with Arena, Minute was stalking Arena's online platforms and scraping its code, in preparation to replicate the websites in knowing violation of Arena's Terms of Use.

64.     ABG and Minute's plan to steal Arena's code and website had at least three parts:

a.  *First*, beginning on March 13, 2024, and likely even earlier, while Arena and ABG were still in active negotiations, Minute began deploying bots to crawl Arena's webpages. These bots scraped Arena's site, *i.e.*, they took images of, and stole code from, the webpages. This web-scraping provided ABG and Minute the raw material necessary to recreate or replicate Arena's site free of charge.

b.  *Second*, ABG and Minute began planning a reverse proxy to steal and redirect traffic from Arena's sites to their newly-constructed mirror sites that were created via the scraping. A reverse proxy is a server which is placed in front of a primary server to intercept traffic directed at that primary server, meaning that the visitor to a site is redirected elsewhere, often without knowing it.

c.  *Third,* ABG and Minute needed to know the digital location of Arena's servers so they could intercept the traffic directed at Arena's servers. This step required information contained in specific zone files maintained within Arena. Zone files contain several sequences of numbers. The sequences act as digital coordinates, identifying the unique servers that are hosting particular web content, *e.g.*, a specific sequence would communicate that SI.com was being hosted on Arena's servers. The sequences also act as a confirmation key which demonstrates ownership of the content and code that is hosted at a particular domain. Amazon Web Services and Google require digital parties interested in selling advertising space on a particular site to authenticate their ownership by providing their unique

17

sequence. By acquiring the zone files, ABG could gain knowledge of the digital coordinates of Arena's servers in order to redirect traffic from Arena's servers to replicated sites on other servers without Arena's knowledge.

65.     Minute's web-scraping and reverse proxy initiative, assisted by ABG, was in brazen violation of Arena's website Terms of Use[12] which are binding on all visitors to Arena's website and specifically prohibit them from, among other things:

- Mak[ing] the Platform available to any third party (via a services arrangement, service bureau, lease, sale, resale, or otherwise);

- Us[ing] our Platform to build a competitive product or service;

- Copy[ing], reproduce[ing], distribut[ing], publicly perform[ing] or publicly display[ing] all or portions of our Platform, except as expressly permitted by us or our licensors;

- Modify[ing] our Platform, remov[ing] any proprietary rights notices or markings, or otherwise make any derivative works based upon our Platform;

- Us[ing] our Platform other than for its intended purpose or in any manner that could interfere with, disrupt, negatively affect or inhibit other users from fully enjoying our Platform or that could damage, disable, overburden or impair the functioning of our Platform in any manner;

- Reverse engineer[ing] any aspect of our Platform or do anything that might discover source code or bypass or circumvent measures employed to prevent or limit access to any part of our Platform.

66.     Arena prominently displayed a link to the Terms of Use on all of its platforms. Further, all visitors and users of Arena's websites and online services must agree to Arena's Terms of Use.

---

[12]     *See* The Arena Group, *Terms of Use*, https://thearenagroup.net/terms-of-use/ at Section 5 (last accessed May 16, 2024).



67.     As a visitor to Arena's website, Minute agreed to and was bound by Arena's Terms of Use.

68.     While ABG and Minute were able to conceal their heist at the time, they left a trail of evidence which firmly establish their theft. Records from Arena's website security system show that beginning on March 13, 2024, Arena's sites were explored and scraped by bots deployed from servers located in Israel, which is where Minute's technical and product development office is located. The bot attacks and scraping continued over several days, increasing in intensity, with the bots continually lifting code, taking images, and mirroring Arena's sites.

69.     Around the same time, ABG took steps to furtively obtain the zone files associated with the SI.com domain, which were needed to redirect traffic from Arena's webservers to Minute's servers that would, in turn, be hosting the mirror site Minute was building by exploiting code stolen from Arena.

70.     ABG could not simply ask the Arena leadership team to turn over the zone files. Doing so would have revealed that ABG was immediately planning to transfer the Sports Illustrated license and had recreated Arena's Sports Illustrated website. Because it would have been technically and practically impossible for ABG and its new counterparty to build their own website in such a short window of time without Arena's assistance, requesting the zone files from

19

Arena leadership would have revealed that ABG and its accomplice (Minute) were stealing Arena's code to replicate the website. Instead, ABG went about obtaining the zone files through a backchannel with the help of a disloyal, self-interested Arena employee.

71.    On March 14, 2024, Michael Sherman, Senior Vice President of Media Brands at ABG, forwarded an email to Arena mid-level managers, including Hillary Drezner ("Drezner"), who formerly ran Sports Illustrated Swim for Arena and now works for Minute. The email forwarded by Sherman was innocuously sent by Ben Jata, ABG's "tech guy" requesting from Arena "zone files for sikids.com and swimsuit", the "database and list of subscribers", and "Google Analytics and Search Console access for both so that ABG could "start mapping and pricing out costs for the transition."

72.    Ben Jata's email revealed ABG's true intentions: "if we are going to ***replicate all content then I need an extract of everything from CMS*** – copy, images, etc." *Id*. In other words, ABG and Minute were planning to reverse engineer Arena's websites and needed portions of Arena's proprietary CMS to complete the process. Minute got these "extracts," in part, by scraping Arena's sites, but still needed the zone files to complete the heist and set up the reverse proxy to host its replicated sites.

73.    Drezner forwarded the email to Mara Milam ("Milam"), an Arena employee who directly reported to her. Milam, following her boss's direction, provided Sherman, Jata, and later other ABG employees, with Search Console access for swimsuit.si.com and lifestyle.si.com, and sent ABG the email subscriber lists requested.

74.    Milam also reached out to a junior member of Arena's tech team requesting the zone files for swimsuit.si.com and lifestyle.si.com, a request she explained was at the direction of Drezner. The more junior tech employee, who was used to providing technical assistance to the

team running Arena's media publications, readily complied. Unable to provide the zone files for the specific components of the website requested, Milam was provided the entire zone file for the entire SI.com website. Milam, in turn, emailed Sherman at ABG the zone file, in the process turning over to ABG the keys to the castle, *i.e.*, the digital coordinates for the Arena servers hosting the network of Sports Illustrated websites.

75.    Drezner was not ignorant in this scheme; she was closely involved in the ABG-Arena negotiations and had recently been told by Bhargava that ABG was threatening to move the Sports Illustrated license. ABG knew that Drezner had fiduciary obligations to Arena and that Arena had placed her in a position of trust, in fact this is why ABG used her as a pawn to obtain the zone files.

76.    A loyal employee with Drezner's level of knowledge would not have complied with ABG's request for the zone files without confirming with Arena senior management first. Drezner did not do this, instead disregarding her duties to Arena, and opportunistically siding with ABG in the hopes that she would be given a role with their new licensing partner running Sports Illustrated Swim. This is precisely what transpired: Drezner resigned from Arena less than two weeks later and was employed by Minute soon thereafter.

77.    Meanwhile, ABG accomplished its goal of obtaining the zone file without revealing to Arena leadership that ABG was preparing to turn the Sport Illustrated websites to another party immediately. Even with the zone file in hand, the immediate transition was only possible because Minute had already brazenly stolen Arena's code included within its proprietary CMS.

78.    This all occurred before ABG disclosed to Arena that it had entered into an agreement on March 17, 2024 to port the Sports Illustrated Portfolio to Arena's competitor, Minute. The ABG-Minute partnership was publicly announced, and Arena became aware of the ABG-

Minute agreement, on March 18, 2024. Privately, ABG and Minute had been partnered for weeks, conspiring to steal Arena's code and publisher relationships.

79.     On March 20, 2024, Arena executives met with Minute, and offered in good faith to facilitate transferring the operation of the SI Licensed Businesses to Minute. To Arena's surprise, Minute rejected Arena's assistance and told Arena executives it did not need their help.

80.     Arena now knows that Minute did not need its assistance because Minute had already been scraping data from Arena's website to obtain Arena's code and content and had been preparing a systematic reverse-proxy campaign to recreate the SI.com domain on its own servers. This was occurring simultaneously with ABG and CVC distracting Arena with fictitious efforts to renegotiate the License Agreement.

81.     On March 21, 2024, now in possession of the zone file given to it by ABG, Minute initiated its reverse-proxy campaign, redirecting SI.com traffic to the mirrored sites it had constructed via its website scraping, a highly-coordinated action that necessarily required significant advance technical preparation and planning. The sophistication and timing of the plan all but confirms ABG's premeditation and necessarily required ABG's active participation: ABG gave Minute access to the SI domains needed to host the stolen code along with Arena's zone files – obtained through ABG's trickery –that were needed to effectuate the reverse proxy.

82.     In its Complaint, ABG admits that it "redirected all URLs on the SI domains to 'static' versions of those websites." Comp. ¶ 89. What ABG leaves out of its Complaint is the extent to which ABG and Minute surreptitiously planned together, for weeks, in the lead-up to all of this.

83.     ABG will surely claim that its conduct was purely defensive, in that it sought to avoid a material interruption in the SI digital business. But a party's desire to mitigate does not

give it license to steal or deceive. Rather than work in good faith with Arena to avoid such an interruption through a fair and equitable transition of the Sports Illustrated Portfolio to Minute, and rather than offering to buy or license Arena's proprietary platform, ABG instead conspired with Minute to engage in a destructive act of self-help which included stealing portions of Arena's CMS.

84.     As a result of the web scraping and the reverse-proxy campaign, Minute was able to misappropriate portions of Arena's CMS, specifically those relating to the Phoenix function, enabling Minute to replicate quickly and as best it could the user experience of Arena's sites. Minute also may have improperly obtained portions of Arena's Tempest technology, allowing it to post new content on the replicated sites. Despite its sophisticated efforts, Minute was not able to obtain the bootscripts of Arena's website which perform specific dynamic functions like image carousels, which allow a site user to cycle through images. In other words, Minute was only able to create a "dead" version of Arena's websites that did not have the same complex mechanics (as is often the case with a knock-off). This jerry-rigging of the SI.com domain may have avoided material disruption in the site, but it required misappropriating Arena's valuable proprietary technology and causing significant damage to Arena's competitive standing.

85.     By stealing Arena's code, ABG and Minute were able to illegally replicate Arena's platform before Minute was able to create its own SI.com website, giving Minute a head start to unfairly compete on the backs of Arena's labor while injuring Arena in the process.

**H.  Minute Poached Arena's Employees, Induced Them to Misappropriate Trade Secrets and Proprietary Information, and Used that Information to Steal Arena's Publisher Partner Relationships**

86.     With the theft of Arena's proprietary technology and replication of its websites nearly complete, the ABG-Minute conspiracy to unlawfully compete with and sabotage Arena's

business was pushed into high gear. Minute systematically poached top Arena employees overseeing its FanNation business and used them as conduits to transfer confidential and trade secret information, in violation of their obligations to Arena; information that Minute then used to interfere with Arena's valuable Publisher Partner relationships.

87.    On March 20, 2024, a mere two days after ABG announced that Minute had obtained the license to the Sports Illustrated Portfolio, at precisely 1:20 EST, Ben Beachler ("Beachler") former Vice President of Channel Oversight and Distribution at Arena, Mark Pattison ("Pattison"), former SVP of Business Development at Arena, and Matt Solorio ('Solorio" together with Beachler and Pattison the "Former Arena Employees"), formerly holding a business development role at Arena, sent nearly identical emails resigning from their positions effective immediately.

88.    Upon information and belief, ABG and Minute knew that the Former Arena Employees held competitive know-how developed at Arena's significant expenditure and had access to proprietary and confidential information related to, among other things, Arena's valuable Publisher Partner relationships. Specifically, the Former Arena Employees had access to Arena's agreements with and unique business terms offered to its Publisher Partners (the "Partner Agreements"), as well as Arena's proprietary list of Publisher Partner relationships and their detailed contact information (the "Publisher Partner List").

89.    Upon further information and belief, Minute and ABG began their coordinated effort to poach the Former Arena Employees and induced them to misappropriate Arena's confidential and trade secret information while the individuals were employed by and held fiduciary duties to Arena, and before the ABG-Minute partnership was made public.

24

90.    Less than two hours after the Former Arena Employees resigned from Arena, on March 20, 2024 Solorio mass-emailed dozens of Arena's "valued" Publisher Partners from his personal Gmail account, inviting them to a Minute-hosted Zoom meeting purportedly to "discuss FanNation going forward":

On Wed, Mar 20, 2024 at 3:16 PM Matt Solorio <mattscottsolorio@gmail.com> wrote:
Valued Publishers,
Please join us for an update to discuss FanNation going forward.
Here is the Zoom Link for the meeting coming up here in a couple of minutes.

https://minutemedia.zoom.us/i/91975852246?pwd=MkJVUlFGczRseihkOE15ZiF1aE1aZz09#success

Thanks all,
Matt

Sent with Mixmax

91.    Upon information and belief, on March 20, 2024 at 4:30 EST, Minute hosted a Zoom meeting attended by the Former Arena Employees and a significant number of Arena's Publisher Partners.

92.    Upon further information and belief, during the meeting, Minute, with the assistance of the Former Arena Employees, encouraged and induced Arena's Publisher Partners to terminate their agreements with Arena *en masse* and to enter into new contracts with Minute, upon information and belief on nearly identical terms.

93.    The timing of the meeting, the attendance of Arena's vast network of Publisher Partners, and the nearly identical terms offered by Minute confirm that this plot was carefully coordinated by ABG and Minute, with the Former Arena Employees having been induced to divulge Arena confidential and trade secret information about the Publisher Partner relationships that Arena had spent years developing.

25

94.     Almost immediately after that meeting, Arena received nearly identical correspondence from over a dozen Publisher Partners seeking to terminate their Arena contracts. The nature and timing of the communications suggest that the Publisher Partners' contract terminations were orchestrated by Minute and that the termination notices likely were drafted by or with the help of Minute, ABG, and/or their respective agents.

95.     The damage inflicted on Arena has been severe: a significant number of Arena's Publisher Partners have since terminated their agreements with Arena and are now working with Minute.

96.     Upon information and belief, Minute did not merely steal Arena's local publisher network, it also intentionally injured Arena in the process by demanding exclusivity from Publisher Partners and threatening to drop Publisher Partners who maintained relationships with Arena's Athlon platform.

97.     The Former Arena Employees' misappropriation of Arena confidential and trade secret information as part of a scheme to steal the Publisher Partners from Arena was in clear violation of their continuing obligations to Arena.

98.     Specifically, the Former Arena Employees consented to Arena's company policies pursuant to which they agreed not to externally disclose, take from Arena, or share with their new employer, Arena's confidential information. (*See* Exhibit A, Employee Confidentiality and Proprietary Rights Agreement (the "Confidentiality Agreement") at Section 2.1). They also agreed that Arena's customer lists, which necessarily encompass the Publisher Partner List, "are trade secrets and shall be solely the property of the employer" and further agreed to refrain, during [their] employment and for a one year period immediately following the termination thereof, from "directly or indirectly calling upon or attempting to solicit or take away any of [Arena's] customers

26

or business products or services, or use protected confidential information from the customer lists." (Exhibit B, Maven January 20, 2020 Employee Handbook (the "Handbook") at 51). Arena's Business Code of Ethics (the "Code of Ethics" attached as Exhibit C) also requires that the Former Arena Employees refrain from taking actions or making statements which might injure "the goodwill or reputation of the Company" or might "adversely affect the morale of the Employees of the Company." All of these obligations survive the termination of employment.

99.    Upon information and belief, the Former Arena Employees are continuing to violate their obligations to Arena which prohibit them from attempting to solicit Arena's Publisher Partners and from encouraging them to work with Minute instead.

**I.    Arena Unequivocally Owns the Platform Called "FanNation"**

100.    ABG's narrative in the ABG Complaint is based on the fundamentally false and ludicrous premise that ABG owns a portion of Arena's platform simply because, pursuant to the License Agreement, Arena hosted certain content at an SI-related URL. Whatever rights ABG may have had under the License Agreement, it never owned, and does not own now, any part of Arena's proprietary hosting platform and business, including Arena's relationships with its Publisher Partners developed entirely by Arena, or the source code for Arena's CMS which is the foundation of FanNation-labeled webpages where Publisher Partners' content was hosted during the tenure of the License Agreement.

101.    Arena expended substantial time, money, and resources to build its platform business prior to any relationship with ABG. After entering the License Agreement, Arena continued to invest in and develop its platform business, including developing the FanNation channels and the publisher relationships which generated content for those channels.

27

102.    Arena did not develop these assets exclusively for ABG's benefit. The presumption underlying ABG's allegation that it owns FanNation is entirely nonsensical in that (i) ABG did not contribute financially or otherwise to the development of the website or Arena's Publisher Partner relationships or Arena's CMS which powers the site; (ii) Arena's proprietary local publisher network platform predates any relationship with ABG; and (iii) the platform includes parts of Arena's business that were wholly separate from, and had nothing to do with, the Sport Illustrated brand.

103.    Moreover, the parties conducted themselves as if Arena owned the FanNation site. For example, ABG acknowledges that Arena "onboarded FanNation publishers as independent contractors" and that Arena did not ask ABG's permission to do so. *Id.* ¶ 104. This was done because Arena, as the creator of the websites it called FanNation and owner of its platform business, had no need to get ABG's signoff to continue to develop or operate that aspect of Arena's business. Arena's only relevant obligations were to ensure that certain content bearing the SI Trademarks was focused on sports coverage, *see* Licensing Agreement § 2(a), and to give ABG an agreed-upon share of the revenues generated by that aspect of Arena's platform. See License Agreement § 1(bb).

104.    But ABG now attempts to rewrite history, mischaracterizing Arena's operation of its platform business—including developing its relationships with publishers, which ABG knew or should have known was occurring for years—as a breach of the License Agreement.

105.    Indeed, ABG goes even further, obscuring the language of the License Agreement to sanction its theft, attempting to obfuscate the fact that it and Minute stole Arena's proprietary code, are blatantly hosting Arena's code and utilizing portions of Arena's CMS on its own servers,

and are using Arena's confidential information to disrupt and convert Arena's relationships with its Publisher Partners.

106.    While Arena may have branded portions of its platform with SI Trademarks as it was permitted to do, that alone does not transform Arena's code for its website, or the relationships underlying its platform business, into ABG property.

107.    Arena continues to operate a network of localized sports media websites, with content created from those remaining Publisher Partners who have not been bullied away from Arena by ABG and Minute, that it now hosts on its Athlon Sports platform.



108.    Athlon is a competitor of Minute, and Arena's competitive advantage has been significantly damaged by the illegal and malicious conduct of ABG and Minute.

**J.    ABG's and Minute's Brazen Theft has Significantly Damaged Arena**

109.    ABG's and Minute's malicious and premeditated plot to steal Arena's trade secret code, proprietary CMS, and Publisher Partner relationships has caused Arena over $200 million in damages.

110.    Arena's proprietary CMS and code, which it built over several years with significant monetary expenditures, was and remains a valuable part of its business. Arena offered to license its platform to ABG and Minute as part of a transition of the Sports Illustrated Portfolio, but ABG and Minute refused, opting to just take it for themselves while damaging Arena, their key competitor, in the process.

111.    Furthermore, Minute's improper poaching of Arena's Publisher Partner relationships using Arena confidential and proprietary information has significantly damaged

Arena's ability to operate and monetize one of its most successful businesses, its network of localized sports websites branded as Athlon. Not only has Arena lost significant revenue from the localized sports website business, but the ABG-Minute theft of Arena's CMS and Publisher Partners has allowed Minute to unfairly compete with Arena on the back of Arena's own labor. But for this theft, the competitive advantage Arena built through its CMS and Publisher Partners would have allowed Arena to capture a greater portion of the market share while Minute was in a buildout phase, which would have generated millions of dollars of additional revenue for Arena over the course of the next several years. Instead, Arena is now fighting just to recover its market standing. Instead, Arena now has to invest in new code at substantial expense and must work to source new publisher relationships (likely at commercially-disadvantageous terms).

<u>**CAUSES OF ACTION**</u>

**COUNT I**
<u>**Unfair Competition**</u>
**(Lanham Act, 15 U.S.C. § 1125)**
**(Against ABG and Minute)**

112.    Arena realleges and incorporates all preceding paragraphs.

113.    At significant effort and expense, Arena has developed and owns its proprietary and confidential CMS, code, encapsulation of raw content, and other technology integral to the web-based platform called FanNation and the Sports Illustrated website .

114.    While ABG distracted Arena with purported good faith negotiations, Minute – with ABG's assistance – engaged in unauthorized website scraping and established a reverse-proxy to unlawfully obtain and host portions of Arena's CMS, producing a false rendering of the FanNation website, Sports Illustrated domain, and other Arena webpages.

115.     Without authorization from Arena, ABG and Minute have used and continue to use, access, and meddle with Arena's computer systems, servers, and websites for Minute's own commercial benefit.

116.     ABG and Minute stole, unlawfully used, and continue to use Arena's confidential and proprietary technology critical to the development of the FanNation website, Sports Illustrated domain, and other Arena webpages, for their own benefit.

117.     ABG and Minute have and continue to misappropriate Arena's labor, skills, expenditures, goodwill, and technology in bad faith. By doing so, Minute has avoided many of the costs it necessarily would have incurred to build its own site by creating its own code and sourcing its own publishing network.

118.     Shortly after ABG and Minute's partnership was publicized, Minute poached Arena's top sales employees running FanNation and induced them to take Arena's proprietary and trade secret information related to Arena's Publisher Partners.

119.     Minute, aided by the Former Arena Employees, used this confidential and proprietary information to solicit Arena's Publisher Partner relationships and induce those Publisher Partners to terminate their agreements with Arena.

120.     Since then, a significant number of Arena's Publisher Partners have terminated their agreements with Arena and are now working with Minute, causing significant damage to Arena.

121.     ABG's and Minute's conduct constitutes unfair competition under § 43(a) of the Lanham Act.

122.     As a result of the foregoing actions, ABG and Minute's acts of unfair competition to the detriment of Arena have caused damage to Arena in an amount to be proven at trial.

31

**COUNT II**
**Violation of Defend Trade Secrets Act 18 U.S.C. § 1836 *et seq.***
(Against Minute and ABG)

123.    Arena realleges and incorporates all preceding paragraphs.

124.    Arena's trade secrets relate to its proprietary software code comprising its Tempest and Phoenix computer systems, the zone file, Arena's list of Partner Publishers, the commercial terms on which Arena engages its Partner Publishers, and Arena's commercial know-how for creating, selecting and arranging website and social media content to maximize audience engagement and traffic to its websites and social media accounts.

125.    All such information and know-how constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

126.    Arena's trade secrets that Minute and ABG misappropriated derive economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Arena's competitors or other persons who might obtain economic value from their disclosure or use.

127.    At all relevant times, Arena has taken reasonable measures to protect the secrecy of the trade secrets that Arena developed through substantial effort and which ABG and Minute have misappropriated, such as by the use and maintenance of computer server and network security protocols and tools, credentialed access to computer networks, limiting the individuals who have access to such trade secrets to those who need it to perform their duties for Arena, and requiring employees and vendors to execute confidentiality agreements or accede to corporate policies limiting their use and prohibiting disclosure of such trade secrets.

128.    Minute and ABG's actions constitute misappropriation under 18 U.S.C. § 1839(5). For example, and without limitation, Minute and ABG took and used Arena's proprietary computer

32

code and list of Publisher Partners without Arena's consent, for their own benefit and to the detriment of Arena.

129. ABG and Minute's misappropriation has caused or threatens to cause damage to Arena, including at least loss of profits, goodwill, and competitive advantage.

130. ABG and Minute's actions in misappropriating Arena's trade secrets were willful, malicious, and done with the intent to injure Arena and improve ABG and Minute's economic opportunities, thereby entitling Arena to punitive damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under § 1836(b)(3)(D).

131. Arena also is entitled to permanent injunctive relief to prevent irreparable harm to Arena, including harm that cannot adequately be compensated by money damages.

**COUNT III**
**Common Law Unfair Competition**
**(Against ABG and Minute)**

132. Arena realleges and incorporates all preceding paragraphs.

133. At significant effort and expense, Arena has developed and retains ownership of its proprietary CMS, encapsulation of raw content, and other technology integral to the web-based platform called FanNation and the operation of the Sports Illustrated websites.

134. Minute engaged in unauthorized website scraping and established a reverse-proxy to unlawfully obtain and host portions of Arena's CMS, producing a false rendering of the FanNation website, Sports Illustrated domain, and other Arena-created webpages.

135. Without authorization from Arena, ABG and Minute have used and continue to use, access, and meddle with Arena's computer systems, servers, and websites for ABG's and Minute's own commercial benefit.

33

136.    While ABG distracted Arena with purported good faith negotiations, Minute stole unlawfully used, and continues to use, Arena's confidential and proprietary technology that Arena utilized for the development of the FanNation website, Sports Illustrated domain, and other Arena webpages, solely for their own benefit.

137.    ABG and Minute have and continue to misappropriate Arena's labor, skills, expenditures, goodwill, and technology in bad faith. By doing so, Arena has avoided many of the costs it necessarily would have incurred to build its own site by creating its own code and developing its own publishing network.

138.    Shortly after ABG and Minute's partnership was publicized, Minute poached Arena's top sales employees running FanNation and induced them to take Arena's proprietary and trade secret information, including information related to Arena's Publisher Partners.

139.    Minute and the Former Arena Employees used this confidential and proprietary information to solicit Arena's Publisher Partner relationships and induce those Publisher Partners to terminate their agreements with Arena.

140.    Since then, a significant number of Arena's Publisher Partners have terminated their agreements with Arena and are now working with Minute, causing significant damage to Arena.

141.    ABG's and Minute's conduct constitutes unfair competition under New York common law.

142.    As a result of the foregoing actions, Minute's acts of unfair competition to the detriment of Arena have caused damage to Arena in an amount to be proven at trial.

**COUNT IV**
**Common Law Misappropriation of Trade Secrets**
**(Against ABG and Minute)**

143.    Arena realleges and incorporates all preceding paragraphs.

144.    Arena possesses data, confidential information, and trade secrets—including its proprietary software code comprising its Tempest and Phoenix computer systems, the zone file, Arena's list of Partner Publishers and contact points, the commercial terms on which Arena engages its Partner Publishers, and Arena's commercial know-how for creating, selecting and arranging website and social media content to maximize audience engagement and traffic to its websites and social media accounts — all of which are not generally known outside of Arena's business, and known only to certain Arena employees and others involved in Arena's business who need to know such information to perform their duties for and render their services to Arena.

145.    Arena takes reasonable measures to maintain the secrecy of such data, information and trade secrets, such as the use and maintenance of computer server and network security protocols and tools, credentialed access to computer networks, limiting the individuals who have access to such trade secrets to those who need it to perform their duties for Arena, and requiring employees and vendors to execute confidentiality agreements or accede to corporate policies limiting their use and prohibiting disclosure of such trade secrets.

146.    In further protection of its trade secrets, Arena required its employees to consent to corporate policies that mandated confidentiality, prohibited unauthorized disclosure, and restricted employees from poaching Arena's customers and business (which includes Publisher Partners) for 12 months after their separation from employment.

147.    Arena's trade secrets have been honed over years of investing effort and capital into development, testing, evaluation, improvement and cultivation of them.

35

148.    Arena's exclusive ownership of its trade secrets provides Arena with an advantage over competitors that would be difficult or impracticable to replicate without Arena's materials and participation.

149.    While the Former Arena Employees were employed with Arena, they had access to Arena's confidential and proprietary trade secrets, which Arena spent years developing and were valuable and not easily duplicated by others.

150.    ABG and Minute encouraged the Former Arena Employees to misappropriate Arena's trade secret information and use that information to induce Arena's Publisher Partners to terminate their relationships with Arena and enter into new relationships with Minute instead.

151.    Minute has used and continues to use the confidential and proprietary trade secrets acquired from the Former Arena Employees.

152.    As a direct result of Minute's conduct, a significant number of Publisher Partners terminated their contracts with Arena and are now instead working with Minute under, upon information and belief, nearly identical terms.

153.    Minute and ABG working in concert stole Arena's proprietary and trade secret technology, code, and CMS developed by Arena at substantial effort and expense and are now using such trade secrets to replicate websites without Arena's permission, saving themselves effort and expense while significantly damaging Arena.

154.    Minute and ABG's conduct was willful and knowing.

155.    Minute and ABG's conduct constitutes misappropriation of trade secrets.

156.    Minute and ABG's acts have caused and threaten to continue to cause damage to Arena, including but not limited to loss of profits, goodwill, and competitive advantage, and also

36

have caused and will continue to cause irreparable harm to Arena that cannot entirely be compensated by money damages.

157.    As a result of the foregoing, Arena incurred significant damages, in an amount to be proven at trial.

**COUNT V**
**<u>Aiding and Abetting Breach of Fiduciary Duty</u>**
**(Against ABG and Minute)**

158.    Arena realleges and incorporates all preceding paragraphs.

159.    The Former Arena Employees and Drezner had fiduciary obligations to their former employer, Arena. As Arena's top sales employees and the General Manager running Sports Illustrated Swim, Arena reposed trust and confidence in them, which was known to ABG and Minute. The Former Arena Employees' and Drezner's fiduciary obligations include a duty not to take action that would harm or damage Arena.

160.    ABG encouraged and induced Drezner to violate her fiduciary duties to Arena by encouraging her to provide ABG with the zone file that would allow ABG and Minute to use the code they stole from Arena.

161.    Upon information and belief, ABG did so by promising Drezner a position running Sport Illustrated Swim at its new partner, Minute, a position she now holds.

162.    Minute and, upon information and belief, ABG induced the Former Arena Employees to violate their fiduciary duties by encouraging them to misappropriate confidential and proprietary information and trade secrets while they were still employed by Arena, including information related to Arena's Publisher Partners.

163.    The confidential and proprietary information misappropriated and shared by the Former Arena Employees, in violation of their fiduciary duties to Arena, allowed Minute to solicit

Arena's Publisher Partner relationships and induce those Publisher Partners to terminate their agreements with Arena.

164.    The timing of the resignations, so soon after the ABG-Minute partnership was publicly announced, strongly suggests that Minute and the Former Arena Employees were coordinating their plan while the Former Arena Employees were still employed by and owed fiduciary duties to Arena.

165.    Further, that Minute hosted a Zoom meeting attended by dozens of Arena's Publisher Partners, coordinated and attended by the Former Arena Employees only two hours after they resigned from Arena, strongly suggests that their efforts to work with Minute to misappropriate confidential and proprietary information and poach the Publisher Partners began while they were employed by Arena.

166.    As a direct result of ABG and Minute's conduct, various Publisher Partners terminated their contracts with Arena and are now working with Minute, on nearly identical terms.

167.    Further, the zone file wrongfully obtained by ABG, through aiding and abetting Drezner in the breach of her fiduciary duties, has allowed Minute to host and redirect traffic to a mirror image of Arena's websites using stolen code.

168.    Through the conduct alleged herein, Minute and ABG have aided and abetted the Former Arena Employees and Drezner to breach their fiduciary duties to Arena.

169.    As a result of the foregoing, Arena incurred significant damages in an amount to be proven at trial.

**COUNT VI**
**Unjust Enrichment**
**(Against ABG and Minute)**

170.    Arena realleges and incorporates all preceding paragraphs.

38

171.    ABG and Minute have unlawfully taken, used, and continue to use Arena's confidential and proprietary information and business relationships, which has saved them millions of dollars and significant time, which they would have otherwise invested on research, development, and marketing to develop their own relationships with third-party publishers and create the technology necessary to host and monetize the Sports Illustrated branded websites.

172.    ABG and Minute have also reaped, and continue to reap, the benefits of years of Arena's work and experience in developing its proprietary and trade secret CMS. ABG, through Minute, used and continues to use its knowledge of and access to Arena's technology, partners, and employees to interfere with and usurp Arena's business relationships.

173.    Due to ABG and Minute's failure to compensate Arena for Arena's labor, skill, efforts, and business and technological developments, ABG and Minute have been unjustly enriched at Arena's expense.

174.    As a result of the foregoing, ABG and Minute obtained substantial benefits at the expense of Arena and Arena has been damaged in an amount to be proven at trial.

**COUNT VII**
**Breach of Contract**
**(Against Minute)**

175.    Arena realleges and incorporates all preceding paragraphs.

176.    All visitors and users of Arena's websites and online services must agree to Arena's Terms of Use. Use of the Arena websites and online services are governed by and subject to the Terms of Use.

177.    At all relevant times, Arena prominently displayed a link to the Terms of Use on Arena's websites, including the Sports Illustrated and FanNation sites.



178.    In addition, Arena put Minute on notice of its Terms of Use on May 5, 2024 in its cease-and desist letter.

179.    The Terms of Use constitute a valid and enforceable agreement between websites and online services' users, *i.e.*, Minute.

180.    Minute is aware that all users must agree to Arena's Terms of Use. As a user itself, Minute agreed to and was bound by Arena's Terms of Use.

181.    Beginning on or about March 13, 2024, Minute began data scraping Arena's platform and initiated a reverse proxy to misappropriate Arena's website, code, and CMS and host mirror sites on the Sports Illustrated domain.

182.    Minute, through its employees and agents, has used and is continuing to use processes to improperly, and without authorization, access and copy data and code owned by Arena on the FanNation website, Sports Illustrated domain, and other Arena webpages.

183.    Minute has breached and continues to breach Arena's Terms of Use, which prohibit (i) making the platform available to any third party, (ii) using the platform to build a competitive product or service, (iii) copying, reproducing, distributing, publicly performing or publicly displaying all or portions of the platform, (iv) modifying the platform, removing any proprietary rights notices or markings, or otherwise making any derivative works based upon the platform, (v)

using the platform other than for its intended purpose or in any manner that could interfere with, disrupt, negatively affect or inhibit other users from fully enjoying the platform or that could damage, disable, overburden or impair the functioning of the platform in any manner, (vi) reverse engineering any aspect of the platform or do anything that might discover source code or bypass or circumvent measures employed to prevent or limit access to any part of the platform.

184. Though bound by Arena's Terms of Use, Minute repeatedly engaged in website scraping and established a reverse proxy to steal and host Arena's code and produce a false rendering of the FanNation website, Sports Illustrated domain, and other Arena webpages.

185. Minute willfully and repeatedly breached, and continues to breach, Arena's Terms of Use.

186. Minute received, and continues to receive, a benefit by profiting from its unauthorized use of Arena's data, code, and content. But for Minute's wrongful, unauthorized, and intentional use of Arena's CMS, it would not have obtained, and would not continue to obtain, such profits.

187. Minute's violation of Arena's Terms of Use constitutes breach of contract.

188. Minute's breach has caused Arena to incur damages, including investigative costs and the costs of developing new code, in an amount to be proven at trial.

### COUNT VIII
### Trespass to Chattels
### (Against Minute)

189. Arena realleges and incorporates all preceding paragraphs.

190. Arena asserts its ownership, possession, and right to its CMS, servers, computer systems, and online platforms essential for its business operations.

41

191.    Without authorization from Arena, Minute has used and continues to use, access, and meddle with Arena's CMS, servers, and websites for Minute's own commercial benefit.

192.    Beginning in or about March 13, 2024, Minute, through its employees and agents, has used and continues to employ improper and unauthorized processes to access, infiltrate, and intermeddle with Arena's computer systems, servers, and online platforms, thereby unlawfully duplicating proprietary data, code, and content owned and/or possessed by Arena.

193.    Minute engaged in unauthorized website scraping and established a reverse proxy to unlawfully obtain and host Arena's code, subsequently producing a false rendering of the FanNation website, Sports Illustrated domain, and other Arena webpages.

194.    Arena has notified Minute that its use and access of Arena's CMS, servers, and websites is unauthorized. In Arena's letter dated May 5, 2024, Arena demanded that Minute cease and desist such unauthorized use and access.

195.    Minute's intentional interference has obstructed Arena's rightful usage and possessory interest concerning its CMS, servers, and online platforms.

196.    Minute's conduct constitutes trespass to chattels.

197.    As a result of the foregoing, Minute's conduct caused damage to Arena and has unjustly enriched Minute, in an amount to be proven at trial.

**COUNT IX**
**<u>Tortious Interference with Contract</u>**
**(Against Minute)**

198.    Arena realleges and incorporates all preceding paragraphs.

199.    Arena had valid binding contracts with dozens of Publisher Partners.

200.    Arena expended significant time, energy and money sourcing, recruiting, and encouraging its network of Publisher Partners to enter into binding Partner Agreements. And, once

those Partner Agreements were signed, Arena spent even more time, energy, and money training the Publisher Partners to create content in a manner that increased search engine optimization and generated maximum views to benefit Arena's business.

201.    Minute was aware of Arena's contractual relationships with the Publisher Partners, and of the value of those agreements, yet Minute wrongfully and maliciously caused the Publisher Partners to terminate their agreements with Arena.

202.    Minute, using proprietary and confidential trade secret information, including the Partner List and Partner Agreements, willfully and improperly obtained by the Former Arena Employees in violation of their contractual and fiduciary obligations to Arena, induced Arena's Publisher Partners to terminate their agreements with Arena and enter into agreements with Minute instead.

203.    Upon information and belief, Minute is offering the Publisher Partners contract terms substantially similar to or better than those terms offered by Arena, confidential and proprietary business terms that Minute learned from the Former Arena Employees, in violation of their obligations to Arena.

204.    Upon further information and belief, Minute is disparaging Arena, demanding exclusivity from Publisher Partners, and has threatened Publisher Partners who have expressed an interest in working with both Arena and Minute.

205.    But for Minute's unlawful solicitation using wrongfully obtained information, it is unlikely the Publisher Partners would have terminated their contracts with Arena.

206.    Minute's conduct constitutes tortious interference with contract.

207.    As a result of the foregoing, Arena has suffered and will continue to suffer significant losses as a result of Minute's conduct.

**COUNT X**
**Tortious Interference with Business Relationships**
**(Against Minute)**

208.    Arena realleges and incorporates all preceding paragraphs.

209.    Arena had business relationships with dozens of Publisher Partners.

210.    Arena expended significant time, energy and money sourcing, recruiting, and encouraging its network of Publisher Partners to form relationships with Arena. Arena spent even more time, energy, and money training the Publisher Partners to create content in a manner that increased search engine optimization and generated maximum views to benefit Arena's business.

211.    Minute was aware of Arena's business relationships with the Publisher Partners, and of the value of those relationships, yet Minute wrongfully and maliciously caused the Publisher Partners to terminate their relationships with Arena.

212.    Minute, using proprietary and confidential trade secret information, including the Partner List and Partner Agreements, improperly and willfully obtained by the Former Arena Employees in violation of their contractual and fiduciary obligations to Arena, induced Arena's Publisher Partners to terminate their relationships with Arena and partner with Minute instead.

213.    Upon information and belief, Minute is disparaging Arena, demanding exclusivity from Publisher Partners, and has threatened Publisher Partners who have expressed an interest in working with both Arena and Minute.

214.    But for Minute's unlawful solicitation using wrongfully obtained information, it is unlikely the Publisher Partners would have terminated their relationships with Arena.

215.    Minute's conduct constitutes tortious interference with business relationships.

216.    As a result of the foregoing, Arena has suffered and will continue to suffer loss from Minute's conduct.

44

**COUNT XI**
**Aiding and Abetting Tortious Interference with Contract**
**(Against ABG)**

217.    Arena realleges and incorporates all preceding paragraphs.

218.    Arena had valid binding contracts with dozens of Publisher Partners.

219.    Arena expended significant time, energy and money sourcing, recruiting, and encouraging its network of Publisher Partners to enter into binding Partner Agreements. And, once those Partner Agreements were signed, Arena spent even more time, energy, and money training and developing the Publisher Partners to create content in a manner that increased search engine optimization and generated maximum views to benefit Arena's business.

220.    ABG was aware of Arena's contractual relationships with the Publisher Partners, and of the value of those agreements, yet ABG encouraged Minute to interfere with those contractual relationships.

221.    Upon information and belief, ABG aided and abetted Minute's tortious interference by introducing Minute to the Former Arena Employees and directing Minute on what information it needed to solicit Arena's Publisher Partners and how to go about stealing those relationships.

222.    Minute, with the aid of ABG, wrongfully and maliciously caused the Publisher Partners to terminate their agreements with Arena.

223.    Minute, using proprietary and confidential trade secret information, which upon information and belief, they learned of from ABG, induced Arena's Publisher Partners to terminate their agreements with Arena and enter into agreements with Minute instead.

224.    But for Minute's unlawful solicitation using information wrongfully obtained with the aid of ABG, it is unlikely the Publisher Partners would have terminated their contracts with Arena.

45

225.    Arena's conduct constitutes aiding and abetting tortious interference with contract.

226.    As a result of the foregoing, Arena has suffered and will continue to suffer loss from ABG's conduct.

**COUNT XII**
**<u>Aiding and Abetting Tortious Interference with Business Relations</u>**
**(Against ABG)**

227.    Arena realleges and incorporates all preceding paragraphs.

228.    Arena had business relationships with dozens of Publisher Partners.

229.    Arena expended significant time, energy and money sourcing, recruiting, and encouraging its network of Publisher Partners to form business relationships. Arena spent even more time, energy, and money training the Publisher Partners to create content in a manner that increased search engine optimization and generated maximum views to benefit Arena's business.

230.    ABG was aware of Arena's business relationships with the Publisher Partners, and of the value of those relationships yet ABG encouraged Minute to interfere with those contractual relationships.

231.    Upon information and belief, ABG aided and abetted Minute's tortious interrerference by introducing Minute to the Former Arena Employees and directing Minute on what information it needed to solicit Arena's Publisher Partners and how to go about stealing those relationships.

232.    Minute, with the aid of ABG, wrongfully and maliciously caused the Publisher Partners to end their relationships with Arena.

233.    Minute, using proprietary and confidential trade secret information, which upon information and belief, they learned of from ABG, induced Arena's Publisher Partners to end their relationships with Arena and enter into agreements with Minute instead.

234.    But for Minute's unlawful solicitation using information wrongfully obtained with the aid of ABG, it is unlikely the Publisher Partners would have ended their relationships with Arena.

235.    Arena's conduct constitutes aiding and abetting tortious interference with business relationships.

236.    As a result of the foregoing, Arena has suffered and will continue to suffer loss from ABG's conduct.

### COUNT XIII
### Aiding and Abetting Trespass to Chattels
### (Against ABG)

237.    Arena realleges and incorporates all preceding paragraphs.

238.    Arena asserts its ownership, possession, and right to its CMS, servers, computer systems, and online platforms essential for its business operations.

239.    Without authorization from Arena, Minute has used and continues to use, access, and meddle with Arena's CMS, servers, and websites for Minute's own commercial benefit, which Minute has done with assistance of ABG.

240.    While ABG distracted Arena with purported good faith negotiations, Minute, through its employees and agents, has used and continues to employ improper and unauthorized processes to access, infiltrate, and intermeddle with Arena's computer systems, servers, and online platforms, thereby unlawfully duplicating proprietary data, code, and content owned and/or possessed by Arena.

241.    Minute, with ABG's encouragement and assistance, engaged in unauthorized website scraping and established a reverse proxy to unlawfully obtain and host Arena's code,

47

subsequently producing a false rendering of the FanNation website, Sports Illustrated domain, and other Arena webpages.

242.    ABG further aided and abetted Minute's conduct by obtaining the zone file through deceptive means and providing it to Minute, which allowed to Minute to access, infiltrate, and intermeddle with Arena's computer systems, servers, and online platforms, without Arena's permission.

243.    Arena has notified Minute that its use and access of Arena's CMS, servers, and websites is unauthorized. In Arena's letter dated May 5, 2024, Arena demanded that Minute cease-and desist such unauthorized use and access.

244.    Upon information and belief, ABG is aware of Arena's May 5, 2024 cease and desist letter but has not directed Minute, its licensor, to cease such unauthorized use and access.

245.    Minute's intentional interference, which was aided and abetted by ABG, has obstructed Arena's rightful usage and possessory interest concerning its CMS, servers, and online platforms.

246.    ABG's conduct constitutes aiding and abetting trespass to chattels.

247.    As a result of the foregoing, ABG's conduct caused damage to Arena and has unjustly enriched ABG, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaimant and Third-Party Plaintiff The Arena Group Holdings, Inc. respectfully requests that the Court:

(a)    Award damages in favor of Arena in an amount to be determined at trial, including statutory and punitive damages;

(b)    Award Arena its costs, including reasonable attorneys' fees and expenses and

48

expert fees;

(c)     Issue an injunction prohibiting ABG and Minute from continuing to use, disclose, store or maintain Arena's proprietary and confidential trade secret information, tortiously interfering with Arena's business and contractual relationships, and unfairly competing with Arena;

(d)     Award pre- and post-judgment interest; and

(e)     Grant such other relief, including pre- and post-judgment interest, as may be just and proper.

## **JURY DEMAND**

Arena hereby demands a trial by jury on all issues so triable.

49

<u>**ARENA GROUP HOLDINGS, INC. ANSWER TO THE COMPLAINT**</u>

Arena responds only to the allegations in the Complaint asserted against it as follows:

<u>**"INTRODUCTION"**</u>[13]

1.      Arena denies the allegations in Paragraph 1.

2.      Arena admits that it did not pay "a quarterly royalty payment of $3.75 million" or the "contractually bargained-for and mandated termination fee of $45 million to ABG—a combined $48.75 million." Arena refers to its filings with the U.S. Securities and Exchange Commission ("SEC") for their content. Arena denies the remaining allegations in Paragraph 2.

3.      Arena denies the allegations against it in Paragraph 3.

4.      Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 4, and on that basis denies them.

5.      Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 5, and on that basis denies them.

6.      Arena admits that it entered into a license agreement with ABG-SI (the "Licensing Agreement") and refers to the Licensing Agreement for its terms. Arena lacks knowledge or information sufficient to admit or deny any remaining allegations in Paragraph 6, and on that basis denies them.

7.      Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 7.

8.      Arena admits "ABG was paid its royalties and commissions as they became due." Arena denies the remaining allegations in Paragraph 8.

---

[13]      Arena neither admits nor denies the contents of the various headings and subheadings in the Complaint, which are reproduced herein solely for convenience.

9.      The allegations in Paragraph 9 are directed toward Bhargava and on that basis Arena makes no response to them.

10.     Arena makes no response to the allegations directed toward Bhargava and denies the remaining allegations in Paragraph 10.

11.     Arena makes no response to the allegations directed toward Bhargava and denies the remaining allegations in Paragraph 11.

12.     Arena makes no response to the allegations directed toward Bhargava and denies the remaining allegations in Paragraph 12.

13.     Arena makes no response to the allegations directed toward Bhargava and denies the remaining allegations in Paragraph 13.

14.     Arena admits that "[o]n January 2, 2024, Arena failed to make the $3.75 million quarterly royalty payment" and that "on January 3, ABG notified Arena of its breach and demanded payment of the $3.75 million quarterly royalty within ten business days." Arena denies the remaining allegations against it in Paragraph 14.

15.     Arena admits that "[o]n January 18 … ABG notified Arena that it was terminating the Licensing Agreement, effective immediately, and demanded payment of $48.75 million." Arena refers to its SEC filings and the Licensing Agreement for their terms and denies the remaining allegations in Paragraph 15.

16.     Arena admits it that it laid off certain SI staff after receiving the January 18 termination notice and that Levinsohn resigned. Arena denies the remaining allegations against it in Paragraph 16.

17.     Arena refers to its SEC filings for their terms and otherwise denies the allegations against it in Paragraph 17.

18.     Arena admits that ABG announced a new partnership with Minute Media on March 18, 2024 and otherwise denies the allegations in Paragraph 18.

19.     Arena admits that it refuses to pay ABG $48.75 million and otherwise denies the allegations in Paragraph 19.

20.     Arena denies the allegations against it in Paragraph 20.

**"PARTIES, JURISDICTION, AND VENUE"**

21.     Arena lacks knowledge or information sufficient to admit or deny the allegations set forth in Paragraph 21, and on that basis denies them.

22.     Arena lacks knowledge or information sufficient to admit or deny the allegations set forth in Paragraph 22, and on that basis denies them.

23.     Arena lacks knowledge or information sufficient to admit or deny the allegations set forth in Paragraph 23, and on that basis denies them.

24.     Arena admits the allegations set forth in Paragraph 24.

25.     The allegations in Paragraph 25 are directed toward Bhargava and on that basis Arena makes no response to them.

26.     Paragraph 26 contains legal conclusions requiring no response.

27.     Paragraph 27 contains legal conclusions requiring no response.

28.     Paragraph 28 contains legal conclusions requiring no response.

29.     Paragraph 29 contains legal conclusions requiring no response.

**"BACKGROUND"**

A.  **"ABG acquires the Sports Illustrated brand"**

30.     Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 30, and on that basis denies them.

31.     Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 31, and on that basis denies them.

32.     Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 32, and on that basis denies them.

33.     Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 32, and on that basis denies them.

**B.  "ABG-SI and Arena enter into the Licensing Agreement"**

34.     Arena admits that it entered into the Licensing Agreement, refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 34.

35.     Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 35.

36.     Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 36.

37.     Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 37.

38.     Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 38.

39.     Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 39.

40.     Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 40.

41.     Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 41.

42.    Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 42.

43.    Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 43.

44.    Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 44.

**C. "Bhargava takes control of Arena and the SI business"**

45.    Arena refers to its SEC filings for their terms and otherwise admits the allegations in Paragraph 45.

46.    Arena denies the allegations in Paragraph 46.

47.    The allegations in Paragraph 47 are directed toward Bhargava and on that basis Arena makes no response to them.

48.    The allegations in Paragraph 48 are directed toward Bhargava and on that basis Arena makes no response to them.

49.    The allegations in Paragraph 49 are directed toward Bhargava and on that basis Arena makes no response to them.

50.    Arena refers to its SEC filings for their statements and otherwise denies the allegations against it in Paragraph 50.

51.    The allegations in Paragraph 51 are directed toward Bhargava and on that basis Arena makes no response to them.

52.    Arena makes no response to the allegations directed toward Bhargava and denies the remaining allegations in Paragraph 52.

53.     Arena admits it made changes to its Board in December 2023 and denies the remaining allegations in Paragraph 53.

54.     Arena admits that a Zoom meeting occurred in December 2023 and denies the remaining allegations in Paragraph 54.

55.     Arena admits that Levinsohn was terminated in December 2023 and otherwise denies the allegations in Paragraph 55.

56.     Arena makes no response to the allegations directed toward Bhargava and denies the remaining allegations in Paragraph 56.

57.     Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 57, and on that basis denies them.

58.     Arena admits that it had discussions with ABG about revised terms for the Licensing Agreement and otherwise denies the allegations against it in Paragraph 58.

59.     Arena denies the allegations against it in Paragraph 59.

60.     Arena denies the allegations against it in Paragraph 60.

**D.  "Arena materially breaches the Licensing Agreement and ABG-SI terminates"**

61.     Arena admits that it "failed to pay the $3.75 million Quarterly Payment" and otherwise denies the allegations in Paragraph 61.

62.     Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 62.

63.     Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 63.

55

64.     Arena admits only that it did not provide ABG-SI with the quarterly statement for the fourth quarter of 2023 and that it did not pay ABG-SI commissions in the third and fourth quarters of 2023 and otherwise denies the allegations in Paragraph 64.

65.     Arena admits that ABG provided Arena with a "Notice of Breach" dated January 3, 2024, refers to that notice for its terms, and otherwise denies the allegations in Paragraph 65.

66.     Arena refers to its SEC filings for their terms and otherwise denies the allegations in Paragraph 66.

67.     Arena admits that it failed to pay the Quarterly Payment but otherwise denies the allegations in Paragraph 67.

68.     Arena admits ABG sent Arena a "Notice of Termination" dated January 18, 2024, refers to the notice for its terms and otherwise denies the allegations in Paragraph 68.

69.     Arena refers to ABG's notice for its terms and otherwise denies the allegations in Paragraph 69.

70.     Arena refers to its SEC filings for their terms and otherwise denies the allegations in Paragraph 70.

71.     Arena admits that it "terminate[d]" SI employees, refers to the written notice to employees for its terms and otherwise denies the allegations in Paragraph 71.

72.     Arena denies the allegations in Paragraph 72.

73.     Arena admits that Levinsohn resigned from Arena's Board and otherwise denies the allegations in Paragraph 73.

74.     Arena admits it "terminate[d] Arena's unionized SI employees" as it was forced to do when ABG terminated the Licensing Agreement, refers to the NLRB filing and players' unions' letter for their terms, and otherwise denies the allegations in Paragraph 74.

75.    Arena denies the allegations in Paragraph 75.

76.    Arena admits that Bhargava purchased additional equity in Arena in February 2024 and otherwise denies the allegations in Paragraph 76.

77.    Arena refers to its SEC filings for their terms and otherwise denies the allegations in Paragraph 77.

78.    Arena refers to its SEC filings for their terms and otherwise denies the allegations in Paragraph 78.

79.    Arena admits that ABG continued to negotiate a new licensing deal in February and March 2024, and lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 79, and on that basis denies them.

80.    Arena refers to the press release and SI Union statement for their terms and otherwise denies the allegations against it in Paragraph 80.

**E.  "ABG finds a new partner and saves SI, but Arena continues its campaign to sabotage SI"**

81.    Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 81, and on that basis denies them.

82.    Arena admits that ABG and Minute Media announced a licensing agreement on March 18, 2024 and lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 82, and on that basis denies them.

83.    Arena admits that a meeting took place with Minute on or about March 21, 2024 and that certain requests were made in that meeting, and otherwise denies the allegations in Paragraph 83.

84.    Arena denies the allegations against it in Paragraph 84.

85.    Arena denies the allegations in Paragraph 85.

86.    Arena refers to ABG's March 21, 2024 letter for its terms and otherwise denies the allegations in Paragraph 86.

87.    Arena denies the allegations against it in Paragraph 87.

88.    Arena denies the allegations against it in Paragraph 88.

89.    Arena admits that ABG and Minute redirected traffic from the Arena-hosted SI.com platform to other websites, and lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 89, and on that basis denies them.

**F.    "Defendants Steal and Infringe ABG's Intellectual Property"**

90.    Arena denies the allegations in Paragraph 90.

91.    Arena denies the allegations in Paragraph 91.

92.    Arena denies the allegations in Paragraph 92.

93.    Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 93, and on that basis denies them.

94.    Arena denies the allegation in Paragraph 94.

95.    Arena denies the allegation in Paragraph 95

96.    Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 96, and on that basis denies them.

97.    Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 97, and on that basis denies them.

98.    Arena denies the allegations in Paragraph 98.

99.    Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 99, and on that basis denies them.

100.    Arena denies the allegations in Paragraph 100.

58

101.    Arena denies the allegations in Paragraph 101.

102.    Arena lacks knowledge or information sufficient to admit or deny the allegations about factors impacting search engine rankings and on that basis denies them, and otherwise denies the allegations in Paragraph 102.

103.    Arena denies the allegations in Paragraph 103.

104.    Arena refers to its publisher agreements and the Licensing Agreement for their terms and otherwise denies the allegations in Paragraph 104.

105.    Arena admits it continues to engage in negotiations with FanNation writers and stakeholders and otherwise denies the allegations in Paragraph 105.

106.    Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 106.

107.    Arena lacks knowledge or information sufficient to admit or deny the allegations about the cited Asset Purchase Agreement and Intellectual Property Assignment Agreement and on that basis denies them, and otherwise denies the allegations in Paragraph 107.

108.    Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 108, and on that basis denies them.

109.    Arena denies the allegations in Paragraph 109.

110.    Arena denies the allegations in Paragraph 110.

### **"CAUSES OF ACTION"**

### **"COUNT I"**

111.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

112.    Paragraph 112 contains legal conclusions to which no response is required.

59

113.    Paragraph 113 contains legal conclusions to which no response is required.

114.    Arena denies the allegations in Paragraph 114.

115.    Arena denies the allegations in Paragraph 115.

116.    Arena denies the allegations in Paragraph 116.

117.    Arena denies the allegations in Paragraph 117.

**"COUNT II"**

118.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

119.    Paragraph 119 contains legal conclusions to which no response is required.

120.    Paragraph 120 contains legal conclusions to which no response is required.

121.    Arena denies the allegations in Paragraph 121.

122.    Arena denies the allegations in Paragraph 122.

123.    Arena denies the allegation in Paragraph 123.

124.    Arena denies the allegations in Paragraph 124.

125.    Arena denies the allegations in Paragraph 125.

**"COUNT III"**

126.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

127.    Paragraph 127 contains legal conclusions to which no response is required.

128.    Paragraph 128 contains legal conclusions to which no response is required.

129.    Arena denies the allegations in Paragraph 129.

130.    Paragraph 130 contains legal conclusions to which no response is required.

131.    Arena denies the allegations in Paragraph 131.

132.    Arena denies the allegations in Paragraph 132.

133.    Arena denies the allegations in Paragraph 133.

134.    Arena denies the allegations in Paragraph 134.

**"COUNT IV"**

135.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

136.    Paragraph 136 contains legal conclusions to which no response is required.

137.    Paragraph 137 contains legal conclusions to which no response is required.

138.    Arena denies the allegations in Paragraph 138.

139.    Arena denies the allegations in Paragraph 139.

140.    Arena denies the allegations in Paragraph 140.

141.    Arena denies the allegations in Paragraph 141.

142.    Arena denies the allegations in Paragraph 142.

**"COUNT V"**

143.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

144.    Paragraph 144 contains legal conclusions to which no response is required.

145.    Paragraph 145 contains legal conclusions to which no response is required.

146.    Arena denies the allegations in Paragraph 146.

147.    Arena denies the allegations in Paragraph 147.

148.    Arena denies the allegations in Paragraph 148.

149.    Arena denies the allegations in Paragraph 149.

150.    Arena denies the allegation in Paragraph 150.

151.    Arena denies the allegations in Paragraph 151.

<strong>"COUNT VI"</strong>

152.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

153.    Paragraph 153 contains legal conclusions to which no response is required.

154.    Paragraph 154 contains legal conclusions to which no response is required.

155.    Arena denies the allegations in Paragraph 155.

156.    Arena refers to the Licensing Agreement for its terms and otherwise denies the allegations in Paragraph 156.

157.    Arena denies the allegations in Paragraph 157.

158.    Arena lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 158 and on that basis denies them.

159.    Arena denies the allegations in Paragraph 159.

160.    Arena denies the allegations in Paragraph 160.

161.    Arena denies the allegations in Paragraph 161.

<strong>"COUNT VII"</strong>

162.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

163.    Paragraph 163 contains legal conclusions to which no response is required.

164.    Paragraph 164 contains legal conclusions to which no response is required.

165.    Paragraph 165 contains legal conclusions to which no response is required.

166.    Paragraph 166 contains legal conclusions to which no response is required.

167.    Paragraph 167 contains legal conclusions to which no response is required.

168.    Paragraph 168 contains legal conclusions to which no response is required.

169.    Arena denies the allegations in Paragraph 169.

170.    Arena denies the allegations in Paragraph 170.

171.    Arena denies the allegations in Paragraph 171.

172.    Arena denies the allegations in Paragraph 172.

**"COUNT VIII"**

173.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

174.    Paragraph 174 contains legal conclusions to which no response is required.

175.    Paragraph 175 contains legal conclusions to which no response is required.

176.    Arena admits it was aware of an agreement between Minute and ABG-SI as of March 18, 2024, but denies any specific knowledge of the terms of that agreement.

177.    Arena denies the allegations in Paragraph 177.

178.    Arena denies the allegations in Paragraph 178.

179.    Arena denies the allegations in Paragraph 179.

**"COUNT IX"**

180.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

181.    Paragraph 181 contains legal conclusions to which no response is required.

182.    Paragraph 182 contains legal conclusions to which no response is required.

183.    Paragraph 183 contains legal conclusions to which no response is required.

184.    Arena denies the allegations in Paragraph 184.

185.    Arena denies the allegations in Paragraph 185.

63

186.    Arena denies the allegations in Paragraph 186.

**"COUNT X"**

187.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

188.    Paragraph 188 contains legal conclusions to which no response is required.

189.    Paragraph 189 contains legal conclusions to which no response is required.

190.    Arena denies the allegations in Paragraph 190.

191.    Arena denies the allegations in Paragraph 191.

192.    Arena denies the allegations in Paragraph 192.

193.    Arena denies the allegations in Paragraph 193.

194.    Arena denies the allegations in Paragraph 194.

**"COUNT XI"**

195.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

196.    Arena makes no response to this "Count XI" as it is not directed at Arena.

197.    Arena makes no response to this "Count XI" as it is not directed at Arena.

198.    Arena makes no response to this "Count XI" as it is not directed at Arena.

199.    Arena makes no response to this "Count XI" as it is not directed at Arena.

200.    Arena makes no response to this "Count XI" as it is not directed at Arena.

201.    Arena makes no response to this "Count XI" as it is not directed at Arena.

**"COUNT XII"**

202.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

203.    Arena makes no response to this "Count XII" as it is not directed at Arena.

204.    Arena makes no response to this "Count XII" as it is not directed at Arena.

205.    Arena makes no response to this "Count XII" as it is not directed at Arena.

206.    Arena makes no response to this "Count XII" as it is not directed at Arena.

207.    Arena makes no response to this "Count XII" as it is not directed at Arena.

208.    Arena makes no response to this "Count XII" as it is not directed at Arena.

209.    Arena makes no response to this "Count XII" as it is not directed at Arena.

210.    Arena makes no response to this "Count XII" as it is not directed at Arena.

### "COUNT XIII"

211.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

212.    Paragraph 212 contains legal conclusions to which no response is required.

213.    Paragraph 213 contains legal conclusions to which no response is required.

214.    Paragraph 214 contains legal conclusions to which no response is required.

215.    Arena denies the allegations in Paragraph 215.

216.    Arena denies the allegations in Paragraph 216.

217.    Arena denies the allegation in Paragraph 217.

218.    Arena denies the allegations in Paragraph 218.

### "COUNT XIV"

219.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

220.    Paragraph 220 contains legal conclusions to which no response is required.

221.    Paragraph 221 contains legal conclusions to which no response is required.

222.    Paragraph 222 contains legal conclusions to which no response is required.

223.    Arena denies the allegation in Paragraph 223.

224.    Arena denies the allegation in Paragraph 224.

225.    Arena denies the allegation in Paragraph 225.

226.    Arena denies the allegations in Paragraph 226.

**"COUNT XV"**

227.    Arena incorporates by reference its responses to all allegations above as if set forth fully herein.

228.    Arena makes no response to this "Count XV" as it is not directed at Arena.

229.    Arena makes no response to this "Count XV" as it is not directed at Arena.

230.    Arena makes no response to this "Count XV" as it is not directed at Arena.

231.    Arena makes no response to this "Count XV" as it is not directed at Arena.

**PRAYER FOR RELIEF**

Arena denies that ABG is entitled to any damages or monetary relief.

**AFFIRMATIVE DEFENSES**

Without assuming the burden of proof where such burden is otherwise on ABG as a matter of applicable substantive or procedural law, Arena asserts the following affirmative defenses.

**First Affirmative Defense**

ABG's Complaint fails to state a claim on which relief can be granted.

**Second Affirmative Defense**

ABG's claims are barred because ABG breached the implied covenant of good faith and fair dealing contained in the Licensing Agreement.

**Third Affirmative Defense**

ABG's claims are barred by the doctrine of unclean hands and/or *in pari delicto*.

66

### Fourth Affirmative Defense

ABG's claims are barred because ABG's own conduct frustrated the purpose of the Licensing Agreement and/or caused its own alleged damages.

### Fifth Affirmative Defense

To the extent there was any use of ABG's copyrighted or trademarked materials, such use was validly undertaken by express or implied license.

### Sixth Affirmative Defense

ABG's claims are barred in whole or in part because the terms of the Licensing Agreement are ambiguous.

### Seventh Affirmative Defense

To the extent ABG suffered any damages, such damages were not caused by Arena.

### Eighth Affirmative Defense

If any damages exist, ABG's claims are barred by ABG's failure to mitigate its damages and because the alleged actions by Arena were necessary to mitigate its own damages.

### Ninth Affirmative Defense

ABG's claims are barred in whole or in part by the doctrines of waiver, abandonment, consent, ratification, release, forfeiture and/or estoppel.

### Tenth Affirmative Defense

ABG's claims are barred in whole or in part by the applicable statutes of limitations, statutes of repose and the equitable doctrine of laches.

### Eleventh Affirmative Defense

ABG's claims are barred in whole or in part because the termination fee ABG seeks is an unenforceable penalty.

67

### Twelfth Affirmative Defense

The damages ABG seeks, if awarded, would result in unjust enrichment to ABG.

### Thirteenth Affirmative Defense

ABG is not entitled to recover attorneys' fees or costs of litigation.

### Fourteenth Affirmative Defense

ABG's claims are barred in whole or in part because ABG's own conduct made Arena's performance under the Licensing Agreement impossible.

### Fifteenth Affirmative Defense

To the extent there was any use of ABG's claimed copyrights or trademarks, such use is protected, and/or exempted from liability, by the First Amendment of the United States Constitution, trademark fair use and/or copyright fair use.

### Sixteenth Affirmative Defense

ABG has abandoned one or more of the trademarks asserted or claimed by ABG in this action.

### Seventeenth Affirmative Defense

Arena reserves the right to assert additional defenses that may be uncovered during the course of this action. Arena has insufficient knowledge or information to determine whether it may have additional, as yet unstated, affirmative defenses available. Arena has not knowingly or intentionally waived any applicable additional affirmative defenses and reserves the right to raise additional defenses as they become known to Arena through discovery in this matter. Arena further reserves the right to amend this Answer, to add, delete, or modify defenses based upon legal theories that may be divulged through discovery, or further legal analysis.

Dated: August 1, 2024
      New York, New York

Deleted: June 7

              Respectfully submitted,

              HARRIS ST. LAURENT & WECHSLER LLP

              By: */s/ Yonaton Aronoff*
                Yonaton Aronoff, Esq.
                Megan Dubatowka, Esq.
                Juanell Riley, Esq.
                40 Wall Street, 53rd Floor
                New York, New York 10005
                yaronoff@hs-law.com
                mdubatowka@hs-law.com
                jriley@hs-law.com
                (212) 397-3370

              *Attorneys for Defendant, Counterclaimant and Third-Party Plaintiff The Arena Group Holdings, Inc.*