## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUTHENTIC BRANDS GROUP, LLC, ABG-SI LLC, and ABG INTERMEDIATE HOLDINGS 2 LLC,<br><br>                        Plaintiffs,<br><br>       v.<br><br>THE ARENA GROUP HOLDINGS, INC. and MANOJ BHARGAVA,<br><br>                        Defendants. | Case No. 24-cv-2432 (JGK) (GS)<br><br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Authentic Brands Group, LLC ("Authentic Brands"), ABG-SI LLC ("ABG-SI"), and ABG Intermediate Holdings 2 LLC ("ABG-IH2," and collectively, "ABG") file this amended complaint against Defendants The Arena Group Holdings, Inc. ("Arena") and Manoj Bhargava ("Bhargava"), and allege as follows:

## INTRODUCTION

1.      This action arises out of the destructive, willful, and unceasing efforts by Arena and its former interim CEO and current majority shareholder, Manoj Bhargava, to sabotage and hold hostage ABG's revered Sports Illustrated ("SI") brand and intellectual property, including SI-related content, copyrights, and trademarks, to avoid the financial consequences of Arena's and Bhargava's decision to renege on Arena's clear contractual obligations under the parties' licensing agreement in a bad faith attempt to prioritize and promote Bhargava's other business interests and bottom line.

2.      This dispute began as a straightforward breach of contract: Arena's failure to pay, at Bhargava's direction, a quarterly royalty payment of $3.75 million and the resulting contractually bargained-for and mandated termination fee of $45 million to ABG—a combined $48.75 million

that Arena (a publicly traded company) has *admitted* that it owes ABG under the parties' licensing agreement in multiple filings with the U.S. Securities and Exchange Commission ("SEC").

3.      But the dispute has quickly grown to include claims for, among other things, unpaid commissions and earned royalties, damage to the SI brand and business, interference with ABG's ownership rights of SI-related intellectual property, tortious interference, trademark and copyright infringement, and conversion.  Arena and Bhargava incurred these additional liabilities when, rather than honor their publicly admitted contractual obligations to pay ABG tens of millions of dollars for Arena's breaches, they instead tried to weaponize their obstinance as a means of threatening ABG and forcing it to capitulate to a series of outrageous demands.  In other words, they explicitly threatened to "go nuclear"—and indeed have—by firing SI's loyal staff, many of whom may have been protected by a collective bargaining agreement, refusing to turn over media and editorial content, websites, and subscriber lists that belong to ABG, refusing to cooperate with ABG and its new SI licensee in transitioning the business, and further damaging the value of the SI brand by posting stolen content on competing websites and creating widespread public and consumer confusion over the future of SI.

4.      For close to three quarters of a century, SI has been the gold standard in sports reporting and storytelling, "the venerable bible of sports journalism."[1]  Generations of athletes and fans have looked to each month's cover of SI's print magazine for *the* definitive images of the sports and cultural heroes of their time.  To appear on the cover of SI is a dream held by millions, and an unparalleled achievement for the few who realize that dream.  SI has an unrivaled record built over decades of chronicling and shaping the most important stories in sports, cementing and bolstering athletes' star power, and nurturing the devotion of millions of fans and readers.  This

---

[1] Kevin Draper and Benjamin Mullin, "Sports Illustrated Thrown into Chaos with Mass Layoffs," N.Y. Times (Jan. 19, 2024), https://www.nytimes.com/2024/01/19/business/media/sports-illustrated-mass-layoffs.html.

combination of SI's unique history and continuing relevance has made the SI brand immensely valuable.

5.      Authentic Brands is the world's largest sports and entertainment licensing company, owning and managing a portfolio of over 40 well-known brands, including such names as Reebok®, Muhammad Ali®, Shaquille O'Neal®, and Brooks Brothers®.  Its business model depends on identifying partners who are committed to maintaining and building the strength of its brands, and, through its affiliates, licensing its brand and other intellectual property rights to those partners so they can operate and grow each brand's businesses around the world.

6.      In 2019, Authentic Brands, through ABG-IH2, acquired the SI brand as well as its archive of editorial and media content and other intellectual property, trademarks, and related assets.  Soon after, ABG-SI entered into an agreement with Arena,[2] pursuant to which it licensed certain of the content, intellectual property, trademarks, and other assets associated with the SI brand (the "Licensing Agreement").

7.      Under the Licensing Agreement, Arena obtained a license to the rights to manage and operate SI's print and digital media businesses—including SI's print and digital magazine, Sports Illustrated for Kids, the Sports Illustrated Swimsuit Issue, si.com, and other SI-branded websites—using SI's valuable content, copyrights and trademarks, and digital channels in the United States and certain other territories.  This gave Arena the opportunity to earn millions of dollars in payments from advertisers and subscribers and other sources of revenue—as it ultimately did.  In exchange, Arena promised to uphold SI's longstanding editorial and journalistic standards, pay ABG-SI a yearly minimum payment of $15 million, plus certain commissions and other royalties, and issue warrants to ABG-SI to purchase shares of common stock of Arena.  The

---

[2] Arena was then known as TheMaven, Inc. ("TheMaven").  As TheMaven's rebranding to Arena is immaterial to this action, the Complaint refers to TheMaven and Arena interchangeably as "Arena."

Licensing Agreement was meant to establish a business partnership for many years, with an initial ten-year term and the possibility of extensions running into the next century.

8.     For several years, this arrangement worked for both parties.  Arena saw significant growth, due in large part to revenue from its management and operation of SI, the crown jewel of its platform.  And ABG was paid its royalties and commissions as they became due.

9.     That all changed in the fall of 2023 when Defendant Manoj Bhargava entered the scene.  Bhargava is a purported billionaire whose "sport" is litigation.  He is best known for owning "5-hour ENERGY," a caffeinated beverage sold in convenience stores and gas stations that has been the subject of numerous government investigations and lawsuits following the deaths and hospitalizations of dozens of consumers.  Bhargava has also been accused of misusing a tangled web of purported charitable entities whose transactions have been challenged by the Internal Revenue Service ("IRS").  And he periodically engages in what his former associates describe as "the January Shuffle," a practice where he exercises complete control over the assets of various closely held companies and reallocates or shifts such assets as he desires.  Recently, the Chair of the Senate Committee on Finance, Senator Ron Wyden, announced an investigation into allegations that Bhargava improperly hid hundreds of millions of dollars in offshore bank accounts over the last 15 years, which could lead to what Senator Wyden called "one of the largest [Foreign Bank and Financial Accounts] penalties in US history, if not the largest,"[3] apparently in order to "maintain control of his company while reducing his tax liabilities."[4]

---

[3] Grace Eliza Goodwin, "Billionaire energy drink mogul hid hordes of cash in Swiss bank accounts, senator's letter alleges," BusinessInsider (Mar. 21, 2024), https://www.businessinsider.com/billionaire-manoj-bhargava-hid-money-swiss-accounts-senators-letter-2024-3.

[4] Ryan General, "Monk-turned-billionaire founder of 5-Hour Energy accused of tax abuse," Yahoo! Finance (Oct. 17, 2024), https://finance.yahoo.com/news/monk-turned-billionaire-founder-5-191134826.html.

10.     While Bhargava appears to have considerable experience with questionable business practices, he has no real expertise in the media industry.  Despite that lack of experience, beginning in the fall of 2023, he took control of Arena through a series of shadowy corporate maneuvers, and with it, the management and operation of the SI business.  In less than five months, Bhargava's new venture not only crashed and burned, but almost took SI down along with it.

11.     Bhargava's takeover of Arena began with a deal to merge Arena and another of his companies, Bridge Media Networks, LLC ("Bridge Media"), into a new entity, with him as majority (65%) owner.  But before that deal was even consummated (Bhargava had until August 2024 to complete and fund his binding commitments under the merger agreement), he moved to take a greater position in Arena by purchasing a large block of equity, and all of Arena's debt, from its largest shareholder at the time.  Bhargava quickly assumed and exercised total control over Arena, including its board of directors, executive leadership, and employees.

12.     Without having an executive position or other apparent authority at the company, Bhargava directed the head of Human Resources to oust Arena's senior leadership team and then installed two of his longtime subordinates on the company's board.  In an early meeting with SI's staff (all of whom were Arena employees), he made clear that Arena would no longer adhere to its operational and editorial standards, and made offensive comments concerning the role of politics and race in journalism, leading to widespread objections from staff, not to mention negative press coverage.  In discussions with then-Chief Executive Officer Ross Levinsohn, Bhargava indicated that he intended to cause Arena to breach the Licensing Agreement by failing to make an upcoming $3.75 million quarterly royalty payment in order to prompt ABG to terminate the Licensing Agreement, so that Bhargava could then use that termination as a pretext for firing scores of Arena's unionized SI staff.  While Arena certainly had more than enough money to make the royalty

payment, that made no difference.  The point was to manufacture a way to get out of Arena's contractual obligations, both to ABG and to Arena's unionized employees.

13.     In a subsequent meeting with ABG, Bhargava demanded the negotiation of a new deal on terms more favorable to him and signaled his plan to use any termination of the Licensing Agreement by ABG as grounds to fire Arena's unionized SI staff.  In response, ABG insisted that Bhargava honor Arena's contractual obligations under the Licensing Agreement, while also negotiating with him to protect the SI brand and mitigate any damages.  None of that mattered to Bhargava, who clearly felt unconstrained by Arena's contractual promises to ABG and believed that he could simply strong-arm ABG into capitulating to his demands.  Bhargava behaved more like a gangster than a trusted business partner and good-faith counterparty, threatening to rip up the Licensing Agreement, and essentially burn everything down and destroy the SI brand, unless ABG entered into a new agreement on completely new terms.

14.     When these negotiations between Bhargava and ABG predictably fell apart, Bhargava made good on his threats.  On January 2, 2024, Arena failed to make the $3.75 million quarterly royalty payment, triggering ABG's right to terminate the Licensing Agreement and collect a termination payment of three years' minimum royalties, or $45 million.  On January 3, ABG notified Arena of its breach and demanded payment of the $3.75 million quarterly royalty within ten business days, in accordance with the terms of the Licensing Agreement.  Once again, Defendants refused, leaving ABG with no choice but to terminate the Licensing Agreement altogether.

15.     On January 18, having not received the $3.75 million quarterly royalty payment, and having provided Arena with the requisite notice and opportunity to cure, ABG notified Arena that it was terminating the Licensing Agreement, effective immediately, and demanded payment of

$48.75 million. Arena has never challenged the propriety of ABG's termination or the fact that it owes ABG $48.75 million under the unambiguous terms of the Licensing Agreement. Nor could it. To the contrary, Arena has *admitted* its contractual payment obligations in three Form 8-Ks filed with the SEC on January 5, January 19, and February 14, 2024.

16.     Within 24 hours of ABG's January 18 termination notice, Bhargava announced mass SI staff layoffs during a seven-minute Zoom call. The reaction to Bhargava's actions was both swift and disastrous. Fans of SI and numerous media outlets lamented the potential shuttering of America's premier sports publication. The union for Arena's SI staff moved to file a grievance, and unions representing athletes from seven professional sports leagues condemned Arena's "union busting" tactics. Arena's stock lost 30% of its value overnight, and it has barely recovered since. Levinsohn resigned and publicly decried Defendants' "abhorrent actions" as "illegal," "riddled with self-dealing," and unlike anything he had witnessed in his three-decade career. As a result, SI's brand and business became inextricably linked with the chaos of Bhargava's mismanagement, and media reports questioned whether SI could even survive.

17.     Even in the face of all of this, ABG remained focused on trying to preserve the SI brand and mitigate the extreme damage caused by Bhargava's bad-faith tactics. ABG continued to try to negotiate a new licensing agreement with Arena, while simultaneously seeking a new partner. Defendants, by contrast, doubled down. Arena and Bhargava not only continued to press their unreasonable demands, but took new steps to undermine the value and reputation of the SI brand and business, such as causing Arena to publish a 5-hour ENERGY press release that was deliberately mislabeled as an SI editorial piece, replacing SI's revenue-generating advertising and video content with a stream from Bhargava's own sports network, "Sports News Highlights," and unilaterally telling the world that SI's decades-long print magazine would soon cease publication

altogether.  Meanwhile, in another Form 8-K filed with the SEC, Arena stated that it expected ABG to waive the $45 million termination fee in exchange for Arena's continued operation of the SI business—an entirely baseless, self-serving fiction since ABG had never indicated any willingness to do so.  In short, Defendants apparently believed that they could somehow get away with their flagrant contractual breaches and extreme bad faith and other misconduct if only they could make things bad enough for ABG to "cry uncle" and surrender.

18.    Instead, on March 18, ABG announced its new partner to manage and operate the SI business—Minute Media—with whom it had entered into a new licensing agreement.  ABG promptly directed Arena to transfer the SI-related licensed assets to Minute Media, including subscriber data and all editorial and other media content created in connection with the SI business, and to cease all use of the SI copyrights, trademarks, and content—anything and everything that is owned by ABG under the Licensing Agreement.

19.    Once again, however, Defendants opted for lawlessness.  Instead of turning over the critical subscriber data that ABG owns, Arena employees instructed third party vendors to either return the data to Arena or to destroy it.  Instead of turning over the editorial and media content that ABG owns, Arena served that content from its own competing websites.  And instead of ceasing to use the SI trademarks, Arena flagrantly violated the Licensing Agreement by plastering those marks on its competing websites as well, creating extremely damaging consumer confusion and threatening SI's search engine optimization ("SEO") performance.  Arena has also tried to hijack the popular "FanNation" platform to compete with SI, relying on an improper application to register the "FanNation" mark with the U.S. Patent and Trademark Office ("PTO"), which was made in violation of the Licensing Agreement and trademark law.  And Arena continues to refuse to pay the

$48.75 million it owes ABG, even as it has conceded this obligation in multiple filings with the SEC.

20.    None of this, of course, was an accident.  It is simply Arena's—and Bhargava's—way of doing business.  Through this action, ABG seeks to hold Defendants accountable for their repeated, willful breaches of contract and other misconduct, including their ongoing interference with ABG's valuable intellectual property rights, all of which has caused substantial harm and damage to ABG and to the SI brand and business.  ABG accordingly seeks a judgment awarding compensatory and other damages, as well as an injunction requiring Arena to comply with its post-termination contractual obligations and prohibiting Defendants from continuing to violate ABG's rights.

## PARTIES, JURISDICTION, AND VENUE

21.    Plaintiff Authentic Brands Group, LLC ("Authentic Brands") is a Delaware limited liability company with its principal place of business in New York, New York.

22.    Plaintiff ABG Intermediate Holdings 2 LLC ("ABG-IH2") is a Delaware limited liability company with its principal place of business in New York, New York.  ABG-IH2's sole member is ABG Intermediate Holdings 1 LLC ("ABG-IH1"), also a Delaware limited liability company with its principal place of business in New York, New York, and ABG-IH1's sole member is Authentic Brands.  ABG-IH2 owns the intellectual property and other assets affiliated with SI referenced herein.

23.    Plaintiff ABG-SI LLC ("ABG-SI") is a Delaware limited liability company with its principal place of business in New York, New York.  ABG-SI's sole member is ABG-IH2, and ABG-SI is the counterparty and licensor to the licensing agreement at issue.

24.     Defendant The Arena Group Holdings, Inc., f/k/a TheMaven, Inc. ("Arena"), is a Delaware corporation whose principal place of business is in New York, New York.

25.     Defendant Manoj Bhargava is the founder, sole manager, Chief Executive Officer, and control person of Simplify Inventions, LLC ("Simplify"), the founder and CEO of Innovation Ventures, LLC ("Innovation Ventures"), the control person and indirect controlling shareholder (including, as of February 2024, majority shareholder) in Arena, and the control person of Bridge Media, a wholly owned subsidiary of Simplify.  On information and belief, Bhargava is a citizen of the state of Michigan.

26.     This Court has personal jurisdiction over Defendants, and venue is proper in this district, because Section 20(h) of the Licensing Agreement provides that each of the parties thereto "(i) submits to the exclusive jurisdiction of the federal courts located in the State of New York … in any action or proceeding arising out of or relating to this Agreement, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court" and "waive[s] any defense of inconvenient forum to the maintenance of any action or proceeding…."  Exhibit 1 ("Licensing Agreement") § 20(h).[5]  Defendant Bhargava is subject to Section 20(h) because he is so closely related to Arena and to the dispute that he can reasonably foresee that the clause would apply to him with respect to ABG's claims.

27.     In addition, this Court has personal jurisdiction over Defendants pursuant to New York C.P.L.R. § 302(a)(1), which provides New York courts with jurisdiction over non-domiciliaries for actions arising from the "transacting of any business within the state."

---

[5] The copy of the Licensing Agreement was previously filed by Arena with the SEC as an exhibit to a Form 8-K/A dated June 14, 2019, and it excludes certain attachments thereto that are irrelevant here.

28.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a).

29.    Venue is further proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

## BACKGROUND

A.    **ABG acquires the Sports Illustrated brand**

30.    Since its founding 70 years ago, SI has been the preeminent sports publication and brand. From its beginning as a weekly print magazine, SI has increased its footprint to an assortment of related brands and digital properties, including, among others, Sports Illustrated Kids, Sports Illustrated Swimsuit Issue, si.com, SI Presents, and FanNation.

31.    Today, SI is the authoritative source for sports news and all things sports-related. Through its extensive reporting and storytelling, SI is a beloved voice among athletes and fans alike. The cover of SI's print magazine is where athletes dream of one day being featured and is among the best known and most revered podiums for athletes and other cultural heroes. To appear on the cover of SI is a universally recognized honor.

32.    ABG is the world's largest sports and entertainment licensing company. ABG owns, manages, and licenses the intellectual and other property of strong, well-established brands, like SI, to best-in-class operating partners in order to optimize long-term value. ABG's many brands include household names across industries, such as Reebok®, Muhammad Ali®, Shaquille O'Neal®, and Brooks Brothers®.

33.    In 2019, through ABG-IH2, ABG acquired the intellectual property (including all editorial and media content, copyrights, and trademarks), as well as domain names and other assets, related to the SI brand. Under ABG's ownership, the SI brand has expanded its legacy and furthered

its cultural relevance by featuring and celebrating a new generation of athletes and stars of all ages, genders, colors, and body types.[6]

**B.    ABG-SI and Arena enter into the Licensing Agreement**

34.    On June 14, 2019—more than four years before Bhargava acquired a stake in Arena—ABG-SI and Arena (then known as TheMaven, Inc.) entered into the Licensing Agreement at issue here.  Under the Licensing Agreement, Arena obtained a license to use certain trademarks and domain names associated with the SI brand, as well as SI-related editorial and media content, in order to manage and operate the SI print and digital businesses, including publishing and distributing the SI print magazine, SI's digital editions and editorial platforms (si.com, among others), and the SI Swimsuit Issue, and publishing news content on SI's constellation of websites and social media accounts.  Arena also obtained the rights to earn revenue from advertising and marketing on the SI publications and digital channels, and to license SI content to third-party websites, mobile applications, and other digital channels, and otherwise agreed to carry on the tradition of excellence that defines the brand.  The Licensing Agreement's "Initial Term" was to run until December 31, 2029, subject to early termination or multiple extensions that could run for up to another 90 years.  Licensing Agreement § 10(a).

35.    More specifically, during the term of the Licensing Agreement, Arena held a license to use the "SI Trademarks" and domain names (including, among others, "fannation.com," which directly relates to certain FANNATION trademarks that ABG bought when it purchased SI); SI-related editorial and media content then in existence or subsequently created by ABG or third parties acting on its behalf (the "SI Content"), or created by Arena or third parties acting on its

---

[6] *See, e.g.*, Mara Milam, "Leyna Bloom's Candor on Visibility For Trans People Is Something We All Need to Hear," Sports Illustrated Swimsuit (Mar. 31, 2022), *available at* https://swimsuit.si.com/swimlife/leyna-blooms-international-trans-visibility-day.

behalf (the "Licensee Created Content"); and subscriber and customer data related to the SI magazines and digital channels (the "Consumer Data"). *Id.* §§ 2(a), 3(b)(i), 4(a).

36.     In exchange, Arena agreed to operate the SI print and digital businesses and to "maintain the quality … and editorial and journalistic standards" by which SI has long been known. *Id.* § 3(b)(i); *see also id.* § 1(eee) (defining the "SI Licensed Businesses"). Arena was responsible for employing and engaging the personnel and contractors necessary to manage and operate the SI businesses. *Id.* § 3(b)(vii).

37.     Arena also agreed to pay ABG certain royalties and commissions. Under Section 7 of the Licensing Agreement, Arena was obligated to pay ABG an annual royalty, calculated as the greater of (i) a "guaranteed minimum royalty" or ("GMR") of $15 million or (ii) an "earned royalty" based upon Arena's annual gross revenues from the business. *Id.* § 7(c). At all relevant times, the GMR was payable quarterly in advance, in installments of $3.75 million (the "Quarterly Payment"). *Id.* § 7(a)(i).

38.     In addition, under Section 7(d), Arena promised to pay ABG quarterly commissions on gambling-related advertising, certain digital commerce initiatives, advertising placed by ABG on the SI platforms operated by Arena, certain live events, and more. *Id.* §§ 6(a)(i), 7(d), Sch. B. Arena was obligated to issue quarterly statements setting forth the amount of commissions payable, and to pay those commissions to ABG, within 30 days following the end of each quarter. *Id.* §§ 7(d)-(e).

39.     Separate from the annual royalties and commissions payable to ABG, as additional consideration for the Licensing Agreement, Arena agreed to issue ABG warrants to purchase shares of common stock in Arena representing 10% of its fully diluted equity as of the issuance date. *Id.* § 7(g). The warrants were to vest at certain times over the term of the Licensing Agreement,

provided that in the event of termination under Section 10(b), all of the warrants would vest immediately. *Id.*

40.     Although Arena received a license to use the SI-related content during the term of the Licensing Agreement, ABG remained "the sole owner and [has] all right, title and interest in and to" all editorial and media content related to the SI magazines and digital channels then in existence or subsequently created by ABG, Arena, or third parties acting on their behalf. *Id.* § 5(a)(i)-(ii).  Arena further agreed "not to take any action inconsistent with" these ownership rights" and to "promptly do such acts and execute, acknowledge, and deliver all such papers as may be reasonably necessary or desirable to cooperate with [ABG's] efforts to obtain, maintain, protect, and/or vest in" ABG ownership of such rights and title. *Id.* § 5(a)(iii).

41.     Finally, Arena agreed not to use the licensed rights in a manner "that would reasonably be expected to (i) tarnish, degrade, disparage or reflect adversely on" SI's brand or on ABG; "(ii) dilute or otherwise harm the value, reputation or distinctiveness of or [ABG's] goodwill used in connection with or symbolized by any" of SI's brand rights; or "(iii) invalidate or cause the cancellation or abandonment of any SI Trademark." *Id.* § 4(e).  This included Arena not "applying for or obtaining any registration of or related to" any trademark, service mark, or trade name confusingly similar to any SI Trademark, or any URL, handle, or domain name confusingly similar to any digital channel. *Id.* § 4(f).

42.     Under Section 10, ABG could terminate the Licensing Agreement prior to the end of the term if Arena "fails to timely satisfy any of its payment obligations" and such failure is not cured within 10 business days of written notice of such breach. *Id.* § 10(b)(i).

14

43.      Upon termination, Arena was obligated to "immediately cease and make no use of" SI's brand rights, *id.* § 4(d), and any and all rights Arena held to the SI-content and consumer data automatically terminate, *id.* § 10(g).

44.      In the event that ABG terminated the Licensing Agreement "as a result of a material breach" by Arena (which includes the failure to pay Quarterly Royalties, as happened here), "the aggregate GMR payable for (x) three (3) Contract Years *or* (y) the remainder of the Initial Term or Renewal Term, as applicable, whichever is less, shall become immediately payable and due upon the effective date of the termination" of the Licensing Agreement.  *Id.* § 10(g)(ii) (defining the "Termination Payment") (emphasis added).  In other words, Arena agreed to pay ABG at least $45 million.[7]

### C.      Bhargava takes control of Arena and the SI business

45.      For the first several years under the Licensing Agreement, Arena functioned as a relatively stable business partner.  Although it had significant debt, its market capitalization was around $100 million, and it published other well-known media brands, such as Men's Journal and TheStreet.  Its CEO at the time, Ross Levinsohn, had significant industry experience.  Arena was, according to public filings, increasing its revenue—it grew from approximately $50 million in 2019 to more than $220 million in 2022.  And prior to 2023, Arena did not miss a single royalty payment due to ABG-SI.

46.      Arena's relationship with ABG changed dramatically, however, once Bhargava took control of the SI business.

47.      Bhargava is a purported billionaire who owns the "5-hour ENERGY" caffeinated beverage brand.  He has faced scrutiny from consumer groups and government authorities over his

---

[7] The Licensing Agreement has been amended through side letters on five separate occasions.  With the exception of certain amendments granting ABG-SI additional commissions due from Arena, the amendments are immaterial here.

business practices.  In one well-known example, in 2013 the Food and Drug Administration ("FDA") opened an investigation into 5-hour ENERGY after reports linked the beverage to 13 deaths and 33 hospitalizations.  Bhargava's companies were also sued by several state attorneys general for deceptive advertising in connection with 5-hour ENERGY.[8]

48.    Bhargava has also faced scrutiny over his web of purported charitable organizations, including IRS challenges to certain transactions and disclosures over the amounts those organizations actually gave away.[9]  Most recently, on March 21, 2024, the Chairman of the Senate Committee on Finance, Senator Ron Wyden, announced an investigation into a foreign bank for allegedly assisting Bhargava, among others, with tax evasion.  Bhargava allegedly used the bank to hide hundreds of millions of dollars overseas over the last 15 years.[10]  According to Senator Wyden, Bhargava's IRS filings did not accurately reflect his control over foreign bank accounts, and the allegations, if true, "could involve potentially the largest individual FBAR penalty in history."  According to subsequent reports, the investigation involves allegations that "Bhargava transferred a $624 million stake in his energy drink company to Indu Rawat, a Canadian citizen connected to a prominent Indian guru," in order "to maintain control of his company while reducing his tax liabilities."[11]

---

[8] *See, e.g.*, Michelle Castillo, "FDA investigating 13 deaths tied to 5-hour Energy," CBS News (July 29, 2013), https://www.cbsnews.com/news/fda-investigating-13-deaths-tied-to-5-hour-energy/; Patience Haggin, "Three U.S. states sue 5-Hour Energy drink over advertising," Reuters (July 17, 2014), https://www.reuters.com/article/2014/07/18/us-usa-energy-drink-lawsuit-idUSKBN0FN06N20140718/#kCEYEJzMLdUzhRGJ.97.

[9] *See, e.g.*, Clare O'Connor, "The Mystery Monk Making Billions With 5-Hour Energy," Forbes (Feb. 8, 2012), https://www.forbes.com/sites/clareoconnor/2012/02/08/manoj-bhargava-the-mystery-monk-making-billions-with-5-hour-energy/?sh=223860d27aea.

[10] *See* Ltr. from Senator Ron Wyden, United States Senate Committee on Finance to L. Ramsey (Mar. 20, 2024), *available at* https://www.finance.senate.gov/chairmans-news/wyden-launches-investigation-of-potential-ongoing-us-tax-evasion-at-swiss-bank-pictet-banks-deferred-prosecution-agreement; Grace Eliza Goodwin, "Billionaire energy drink mogul hid hordes of cash in Swiss bank accounts, senator's letter alleges," BusinessInsider (Mar. 21, 2024), https://www.businessinsider.com/billionaire-manoj-bhargava-hid-money-swiss-accounts-senators-letter-2024-3 (citing sources indicating that "Person 1" is Bhargava).

[11] Ryan General, "Monk-turned-billionaire founder of 5-Hour Energy accused of tax abuse," Yahoo! Finance (Oct. 17, 2024), https://finance.yahoo.com/news/monk-turned-billionaire-founder-5-191134826.html.

49.     In recent years, Bhargava, with absolutely no relevant experience or track record, began entering the media business, citing "the growing cost of advertising for 5-hour ENERGY" and his view that since advertising was getting more expensive, he should be on the receiving end of advertising revenue.[12]    Beginning in 2022, Bhargava acquired NEWSnet, a Michigan broadcasting company, and Sports News Highlights ("SNH"), a 24/7 sports news and highlights channel.

50.     In August 2023, Bhargava, through Simplify, signed a letter of intent with Arena for Arena to merge with another Bhargava-owned company, Bridge Media, with Bhargava obtaining ownership of 65% of the post-merger entity.  In exchange, Simplify made a $50 million cash investment in Arena and gave it a five-year guaranteed advertising commitment of approximately $60 million from a group of consumer brands owned by Simplify, including 5-hour ENERGY.[13]  Arena and Bhargava reached agreement on terms in early November 2023.

51.     Bhargava added to his equity position in early December 2023, when he caused Simplify to enter into an agreement with Bryant R. Riley and several of Riley's related companies to purchase Riley's equity in Arena.  Concurrently, Renew Group Private Limited ("Renew"), a Singaporean company with a financial interest in Simplify, agreed to purchase additional Arena debt held by Riley's companies.  According to former Bhargava associates, Bhargava's businesses rely heavily on funding from Renew and an Indian entity which holds the family assets of Shri Hans Ji Maharaj, Bhargava's former guru and the namesake for the Hans Foundation.  Reflecting Renew's deep ties to Bhargava, Renew's website lists among its investments 5-hour ENERGY,

---

[12] Jake Newsham & Jake Swearingen, "A billionaire energy drink mogul elbowed his way into publishing Sports Illustrated—now he's lost it," BusinessInsider (Mar. 17, 2024), *available at* https://www.businessinsider.nl/a-billionaire-energy-drink-mogul-elbowed-his-way-into-publishing-sports-illustrated-now-hes-lost-it/.

[13] Simplify also received $25 million in preferred stock.  Hans Foundation, a purported non-profit organization that Bhargava previously ran and for which he continues to serve as the primarily funder, purchased $25 million in preferred stock as well.

Diagnostic Green, and HANS Premium Water—companies also listed as investments on the website of MBX Group, a Bhargava company which shares Arena's 230 Park Avenue address.

52.    However, notwithstanding his purchase of Riley's equity in Arena, on information and belief, Bhargava (through Simplify) remained a minority shareholder in Arena until mid-February 2024, with approximately 40% of Arena's common equity.  The proposed merger transaction was never completed, as Bhargava caused Arena, Simplify, and the other relevant parties to terminate the merger agreement.  Instead, on information and belief, Bhargava intentionally shuttered Bridge Media in order to avoid his merger obligations and converted $15 million of Arena's debt, owned by Simplify, into equity in Arena.

53.    Even as a non-majority holder in Arena, Bhargava quickly went about exploiting Arena for his own benefit and treated the company like his personal fiefdom.  In October 2023, for example, before he even had a formal role or any apparent authority, Bhargava flew several SI Swimsuit Issue models on his private jet to 5-hour ENERGY's Farmington Hills, Michigan campus to pitch them on selling his energy drink, and to Minnesota, where they toured Bhargava's recently acquired ShopHQ network for him to pitch them on selling other products.[14]

54.    Moreover, according to former Bhargava associates, Bhargava caused Arena to run advertisements for 5-hour ENERGY products on its websites at discounted rates, depriving Arena of revenue to benefit Bhargava's other company.  Bhargava has also caused Arena to lease office space from one of his other closely held companies at 230 Park Avenue in New York City— meaning Arena must pay rent on expensive Manhattan office space to another Bhargava company.

---

[14] Josh Kosman, "Sports Illustrated publisher takes swimsuit models on private jet months after agreeing to buy magazine: sources," (Mar. 7, 2024), at https://nypost.com/2024/03/07/business/sports-illustrated-publisher-takes-swimsuit-models-on-private-jet-months-after-magazine-purchase/.

55.    Around this time, on information and belief, Bhargava developed a plan to sideline Levinsohn (then the CEO), cause Arena to breach its Licensing Agreement with ABG, and fire Arena's SI unionized staff.  On information and belief, as of November 2023, Bhargava gained indirect control of Arena through his substantial minority position and ownership of Arena's debt and began to put his plan in motion.

56.    In December 2023, Arena announced the resignation of two board members who then were replaced by Cavitt Randall and Chris Fowler, Bhargava's longtime and loyal subordinates.[15]  On information and belief, still without any formal role or apparent authority, Bhargava directed Arena's head of Human Resources to fire the company's Operations President and COO, Media President, and General Counsel, and compelled Arena's board to retroactively authorize the terminations a week later.

57.    Also in December 2023, Bhargava convened an in-person and Zoom meeting with all of Arena's employees where he introduced himself and outlined his vision for the company. During that meeting, as was later publicly reported, Bhargava insulted the staff and called the company "poorly run."  Bhargava also made clear that he did not intend to respect editorial independence or journalistic standards, calling the media "biased" and criticizing coverage of race and race-related issues.  He also made misogynistic, sexist, and transphobic statements in discussions with SI staff.

58.    Several days later, Bhargava removed Levinsohn as CEO and installed himself as CEO on December 11, 2023.

---

[15] "The Arena Group Holdings, Inc. Announces Board Changes," MarketScreener (Dec. 5, 2023), https://www.marketscreener.com/quote/stock/THE-ARENA-GROUP-HOLDINGS--133025679/news/The-Arena-Group-Holdings-Inc-Announces-Board-Changes-45512275/.

59.     With control of Arena, Bhargava turned his attention to reneging on the Licensing Agreement with ABG.  On December 20, 2023, several of ABG's executives flew to Minnesota to meet with Bhargava.  At that meeting, Bhargava threatened that he would cause Arena to withhold the next Quarterly Payment, due on January 2, 2024.  Bhargava also threatened to use any subsequent termination of the Licensing Agreement as a pretext for terminating SI's unionized staff, and said that he intended to use SI to sell his other companies' products.[16]  Bhargava has since claimed that he withheld the Quarterly Payment, and other payment obligations, because Arena was insolvent and did not have enough money to make payroll.  But Bhargava's scheme was purely cynical—according to Levinsohn, Arena had "more than enough" money to cover the Quarterly Payment.  More recently, however—and following ABG's commencement of this action—Arena has stated in its May 17, 2024 Form 10-Q filed with the SEC that "there is substantial doubt about the Company's ability to continue as a going concern" for the coming year, "unless it is able to refinance or modify its current debt."  Exhibit 2 ("May 17, 2024 Form 10-Q").[17]  As noted, of course, it is Bhargava who purchased all of Arena's debt in November 2023, and on information and belief, Bhargava remains the sole or majority holder of Arena's debt today, which means that according to Bhargava himself, and Arena's SEC filings, he controls whether Arena is adequately capitalized so as to remain a going concern—and he decides whether Arena can satisfy a judgment for its flagrant breach of contract and other unlawful actions.

60.     Faced with these threats, ABG sought to avoid or mitigate any harm to the SI brand and business by continuing to engage in discussions with Bhargava.  At the time, and without having identified an alternative partner, ABG was extremely concerned that if it did not continue

---

[16] Although the collective bargaining agreement would be up for renegotiation (or potentially termination) at the end of 2024, Bhargava was unwilling to wait even that long and was personally opposed to the idea of Arena having a union for any period of time at all.

[17] Exhibit 2 excludes the voluminous attachments to the May 17, 2024 Form 10-Q that are irrelevant here.

its partnership with Arena, there would be no one to manage and operate the SI business. ABG also expected that, as the parties had done on several prior occasions (all before Bhargava's involvement), any revisions to the parties' arrangement could be made through side letter amendments to the Licensing Agreement, rather than by terminating the Licensing Agreement entirely and triggering Bhargava's plan to terminate SI's unionized staff.

61.    During the first week of January, ABG executives and Bhargava met in Miami, where Bhargava again threatened to default on Arena's Quarterly Payment obligations in order to terminate and replace the Licensing Agreement with an entirely new contract with terms that were more favorable to him and Arena. Trapped between a rock and a hard place, ABG discussed with Bhargava the potential terms of a new licensing agreement. Bhargava, in turn, proposed terms that made no commercial sense for ABG.

62.    In the meantime, Bhargava continued to plunder the SI business, disregarding journalistic standards and upending what had been a culture committed to equality with a pattern of sexist, misogynistic, and other outrageous and offensive behavior. For example, Bhargava told the General Manager of SI Swimsuit ("Swimsuit," responsible for the iconic Sports Illustrated Swimsuit Issue) that he planned to use the magazine to sell his other companies' products. However, when he found out that Swimsuit promoted a modern and inclusive definition of beauty (including transgender models), he immediately pushed to either shut down Swimsuit entirely, return Swimsuit to ABG, or separate Swimsuit into two magazines—one highlighting women who better suited his personal tastes, and the other for those who did not.

63.    Indeed, from the outset, Bhargava has not recognized any distinction between Arena and his personal interests, abusing his control of Arena to benefit himself personally and his other businesses. Bhargava has regularly used his 5-hour ENERGY email address while conducting

Arena business, even when sending draft agreements and confidential information. Bhargava also installed his personal spokespersons, Steve Janise and Vince Bodiford, as Arena's public relations team. As with Bhargava, Janise and Bodiford use email addresses with other Bhargava entities. And Bhargava has used Arena's license for SI's digital sites to promote his other businesses. For example, on information and belief, Bhargava instructed that video content on si.com's home page be replaced with an embedded Sports News Highlights video player (from another Bhargava-owned business, Bridge Media), along with a permanent "5-hour ENERGY" logo—benefitting both of his other companies. Bhargava repeatedly refused ABG's request to remove his video player and advertising banner.[18]

64.     Additionally, Bhargava periodically engages in what his former associates describe as the "January Shuffle," a practice where he exercises complete control over the assets of various closely held companies and reallocates or shifts such assets as he desires. Consistent with this practice, Bhargava shuttered Bridge Media (on information and belief, to avoid its merger obligations to Arena) and, based on the company's recent SEC filings, has left Arena undercapitalized.

### D.     Arena materially breaches the Licensing Agreement and ABG-SI terminates

65.     Consistent with Bhargava's prior threats, on January 2, 2024 Arena failed to pay the $3.75 million Quarterly Payment due to ABG-SI under the Licensing Agreement.

66.     Arena's failure to make the Quarterly Payment constituted a breach of Section 7(c) of the Licensing Agreement and gave ABG-SI the right to terminate the Agreement.

67.     Around that same time, Arena (through Bhargava) hid commissions owed to ABG-

---

[18] The SNH video showed clips from various events that SNH received by virtue of its low-power TV license, which is intended to ensure those that otherwise might not receive broadcast coverage have access to content. When ABG asked whether this usage by Arena on SI's national websites complied with its license, Arena represented that it did but refused to provide the legal opinion on which it was purportedly relying.

SI.  Under Sections 7(d) and 7(e), within 30 days following the end of each contract quarter, Arena was required to deliver to ABG-SI quarterly statements detailing, among other things, "any commissions payable pursuant to this Agreement," and to pay all commissions due.

68.    Arena failed to provide ABG-SI with the quarterly statements for the third and fourth quarters of 2023 or to pay ABG-SI the commissions due for those quarters, in breach of Sections 7(d) and 7(e).  On information and belief, Bhargava caused Arena to fail to deliver the quarterly statements in order to keep ABG in the dark about Arena's revenues, and the statements would have revealed approximately $3 million in unpaid earned royalties and commissions.

69.    On January 3, 2024, ABG provided Arena with a Notice of Breach, citing Arena's failure to pay and demanding that Arena cure the breach by making the payment "within the time frame permitted under the Agreement (i.e., ten (10) Business Days)."  <u>Exhibit 3</u> ("Notice of Breach").  The notice further informed Arena that its failure to pay within the permitted cure period would give ABG "the right, but not the obligation to terminate the Agreement," and that ABG "intends to exercise such right," at which point Arena would also be liable for the $45 million Termination Payment "immediately."  *Id.*

70.    On January 5, 2024, Arena filed a Form 8-K with the SEC acknowledging that it had "failed to make a quarterly payment due to" ABG-SI of $3.75 million, that this failure gave ABG-SI "the right to terminate the" Licensing Agreement, and that ABG-SI had sent Arena a notice of breach "with the intent to exercise its right of termination."  Arena stated that it was "in discussion with ABG."  <u>Exhibit 4</u> ("Jan. 5, 2024 Form 8-K").

71.    Arena failed to make the Quarterly Payment within the cure period.

72.    On January 18, 2024, ABG sent Arena a Notice of Termination, informing Arena that ABG-SI "hereby terminates the [Licensing] Agreement, effective as of the date of this" Notice

of Termination based on Arena's failure "to timely cure" the missed Quarterly Payment.  Exhibit 5
("Notice of Termination").

73.     The Notice of Termination informed Arena of the "Effect of Termination of the
[Licensing] Agreement," which included that (1) the rights granted to Arena under the Licensing
Agreement "regarding the SI Content, Licensee Created Content, Consumer Data and SI Licensed
Business" were terminated, and (2) the Termination Payment became "immediately payable and
due."

74.     The day after ABG-SI terminated the Licensing Agreement, on January 19, Arena
filed another Form 8-K with the SEC, acknowledging its failure to make the Quarterly Payment
and that ABG-SI had "notified [Arena] of its intention to terminate the Licensing Agreement,
effective immediately, in accordance with its rights under the Licensing Agreement."  Arena's
Form 8-K also disclosed that "[u]pon such termination, a fee of $45 million became immediately
due and payable by [Arena] to ABG pursuant to the terms and conditions of the Licensing
Agreement," as did "any outstanding and unvested warrants to purchase shares of the Company's
common stock…."  Once again, Arena stated that it was in "continuing discussions with ABG-SI
regarding the Licensing Agreement."  Exhibit 6 ("Jan. 19, 2024 Form 8-K").

75.     That same day, in accordance with his plan, Bhargava held a seven-minute Zoom
call with SI staff, during which he announced that Arena would lay off nearly all of them.[19]  The
written notice to employees could hardly have been clearer—it stated that "[a]s a result of this
license revocation, we will be laying off staff that work on the SI brand."  Arena also proceeded to
terminate Arena's unionized SI employees.

---

[19] Dade Hayes and Ted Johnson, "Sports Illustrated's Entire Staff Told Their Jobs Have Been Eliminated After
Authentic Brands Revokes License To Publish; Union Vows To 'Fight For Every One Of Our Colleagues,'" Deadline
(Jan. 19, 2024), at https://deadline.com/2024/01/sports-illustrated-staff-layoff-authenic-brands-arena-group-
1235797884/.

76.     Bhargava's gambit was met with immediate and widespread condemnation.[20]

77.     Levinsohn, Arena's former CEO (whom Bhargava had fired), resigned from Arena's Board, blasting Bhargava's "obliteration of Sports Illustrated's storied newsroom" and calling Bhargava's "union busting tactics" the "last straw."  Levinsohn cited the "abhorrent actions of this board over the past six weeks" as "illegal, riddled with self-dealing, and [ones that] will almost certainly lead to shareholder lawsuits."

78.     The SI staff's union, in turn, responded by filing a formal grievance with the National Labor Relations Board on January 29, alleging that Arena fired its SI employees for their "support of the Union engagement in Union activities and/or engagement in other protected activities."[21]  Players' unions from Major League Baseball, the National Basketball Association, the National Football League, National Hockey League, National Women's Soccer League, and United Soccer League (all important SI constituencies) piled on, writing a letter to SI management that took issue with Arena's actions, as reported by media outlets.[22]

79.     As a result, Arena's stock price plummeted by 30%.[23]

80.     According to former Bhargava associates, Bhargava ignored corporate formalities and fired Arena executives, including Levinsohn, terminated SI's unionized employees, and

---

[20] Kevin Draper and Benjamin Mullin, "Sports Illustrated Thrown into Chaos with Mass Layoffs," N.Y. Times (Jan. 19, 2024), *available at* https://www.nytimes.com/2024/01/19/business/media/sports-illustrated-mass-layoffs.html; Sara Fischer, "Sports Illustrated Mess Spells Trouble for the Arena Group," Axios (Jan. 20, 2024), https://www.axios.com/2024/01/20/sports-illustrated-arena-group-deal-layoffs; Nicole Kraft, "Mass Layoff Appears to be the End of Sports Illustrated," Forbes (Jan. 21, 2024), https://www.forbes.com/sites/nicolekraft/2024/01/21/mass-layoff-appears-to-be-the-end-of-sports-illustrated/?sh=37576e1d75e5;

[21] Ben Strauss, "Sports Illustrated union files labor grievance over mass layoffs," Washington Post (Jan. 29, 2024), at https://www.washingtonpost.com/sports/2024/01/29/sports-illustrated-layoffs-nlrb-complaint/.

[22] Michale McCann and Eben Novy-Williams, "Players' Associations Warn Sports Illustrated on Union Busting," Sportico (Mar. 5, 2024), https://www.sportico.com/law/news/2024/sports-illustrated-union-leagues-nflpa-mlbpa-1234769316/.

[23] Bill Peters, "Arena Group's stock plummets over 30% after losing rights to Sports Illustrated, laying off staff," MarketWatch (Jan. 19, 2024), https://www.marketwatch.com/story/arena-groups-stock-plummets-over-30-after-losing-rights-to-sports-illustrated-laying-off-staff-a7e8045c.

eliminated SI's editorial discretion, on information and belief, all in service of Bhargava's plan to drive down Arena's share price so that he could acquire additional equity on the cheap.

81.      On February 13, on information and belief, Bhargava purchased an additional $12 million of Arena's shares, bringing his equity stake in the company to more than 50% (even without having yet purchased the shares under the November 2023 agreement).

82.      On February 14, in another Form 8-K filed with the SEC, Arena again acknowledged its breach of the Licensing Agreement, ABG's valid termination, and the fact that upon such termination on January 18, 2024, the Termination Payment became "immediately due and payable by" Arena under the Licensing Agreement.  Arena again cited "continuing discussions" over a possible new licensing agreement.  Exhibit 7 ("Feb. 14, 2024 Form 8-K").

83.      In another SEC filing made on February 9 for an entity called "New Arena Holdco, Inc.," Defendants misleadingly disclosed the baseless expectation that ABG-SI "will forgo the $45 million fee due upon termination of the Licensing Agreement" in exchange for Arena continuing "to operate the businesses supporting the Sports Illustrated licenses in a manner consistent with its historic quality standards."  Exhibit 8 ("Feb. 9, 2024 Form S-4").  That was pure fiction.  At no point did ABG-SI ever indicate anything like that to Bhargava, Randall, Fowler, or anyone else associated with Arena.  In other words, while Arena indisputably acknowledged its breach of the Licensing Agreement and the $48.75 million it owed to ABG as a result, Defendants apparently believed they could avoid the consequences of that breach by forcing ABG to remain business partners under the threat of destroying the SI brand and business altogether.

84.      In the weeks following termination of the Licensing Agreement, in order to prevent further damage and mitigate the harm to the SI brand and business already caused by Defendants, ABG continued to attempt to negotiate a new licensing deal with Bhargava while it simultaneously

sought a new and more appropriate partner.  Those attempts were not successful.

85.    Meanwhile, Bhargava continued to undercut the SI business, often in ways that drew negative media attention and, on information and belief, were intended to try to increase pressure on ABG to accept his unilateral demands to cut a new deal.  In late February 2024, for example, a 5-hour ENERGY press release about a racing sponsorship was posted on si.com with an "SI Staff" byline and no indication of its actual origin.  In response, the SI Union issued a statement to members that these actions were "totally unacceptable and a blatant breach of the most basic journalistic ethics," and the Union filed a grievance over the story.[24]  Bhargava's businesses also dominated the SI print magazine, comprising four of the 12 advertisements in the March edition.  Also drawing negative press attention toward SI was Bhargava's decision to pull an upcoming print magazine story about transgender boxers.[25]  Finally, in March, Arena made a newsroom announcement to SI staff (also widely reported) that it would be ceasing publication of the SI print magazine—which was contrary to statements made at the time by ABG.[26]  Arena's statements, which were on information and belief directed by Bhargava, were intended to cause further consumer confusion and harm to the SI brand and business.

E.    **ABG finds a new partner and saves SI, but Arena continues its campaign to sabotage SI**

86.    As early as January 30, 2024, it was reported that Minute Media (the publisher of sports websites like The Player's Tribune and FanSided) was interested in licensing SI's brand

---

[24] A.J. Perez, "Is the Owner of 5-Hour Energy Drink Turning 'Sports Illustrated' Into a 5-Hour Energy Promotional Arm?," Front Office Sports (Feb. 29, 2024), *available at* https://frontofficesports.com/is-the-owner-of-5-hour-energy-drink-turning-sports-illustrated-into-a-five-hour-energy-promotional-arm/.
[25] Ben Strauss, "Sports Illustrated publisher pulls transgender boxing story from magazine," Washington Post (Feb. 1, 2024), *available at* https://www.washingtonpost.com/sports/2024/02/01/sports-illustrated-trans-boxing-story/.
[26] Benjamin Mullin, "Sports Illustrated's Employees Are Told Print Edition Will Close in May," N.Y. Times (March 14, 2024), *available at* https://www.nytimes.com/2024/03/14/business/media/sports-illustrated-print-edition.html.

rights from ABG and taking over the management and operation of the SI business that was previously licensed to Arena.[27]

87.    On March 18, 2024, ABG and Minute Media announced that they had entered into a new licensing agreement granting Minute Media the right to manage and operate the SI businesses previously licensed to Arena under the Licensing Agreement (as well as other rights).[28]

88.    On March 21, 2024, executives from Minute Media agreed to meet with Bhargava, Randall, and others to address the transfer of the SI licensed business.  At that meeting, Minute Media requested that Defendants support an orderly transition of all of the SI Content, subscriber data, advertiser information, and third-party vendor contracts.  In exchange, Minute Media offered Arena a revenue share for a period of time, a SaaS license, and a renegotiation of a deal between Arena and STN Video (a video highlights player owned by Minute Media and licensed by Arena and other sports media companies), among other things.  The total commercial value of Minute Media's proposal amounted to approximately $6 million in cash and cost savings.

89.    On information and belief, it became clear to Minute Media that Bhargava did not even comprehend the proposal given his lack of understanding of the media business and related technology.  Instead, Bhargava responded by demanding to be paid a $50 million ransom—a figure that he pulled from thin air and refused to even begin to try to explain.  If Minute Media did not agree to pay that ransom, Bhargava threatened to "go nuclear," suggesting that he was prepared to somehow delete SI's content archives (among other things).  Bhargava's irrational behavior and unfounded demands betrayed his lack of understanding of the business and were part-and-parcel of his months-long effort to ramp up the threats to the SI business if ABG refused to waive the unpaid

---

[27] Sara Fischer, "Minute Media valued at over $1B after new round of funding," Axios (Jan. 30, 2024), https://www.axios.com/2024/01/30/minute-media-valued-over-1b-new-funding.
[28] Benjamin Mullin, "A New Chapter for Sports Illustrated, With Plans to Keep Print," N.Y. Times (Mar. 18, 2024), *available at* https://www.nytimes.com/2024/03/18/business/sports-illustrated-magazine.html.

$48.75 million Quarterly Payment and Termination Payment that were the clear contractual consequences of Arena's admitted, publicly disclosed breach.

90.    Later that day, Randall threatened that Arena would shut down SI's websites within 24 to 48 hours. On information and belief, this threat was also made as part of Defendants' ongoing efforts to force ABG to waive the amounts due under the Licensing Agreement. Obviously, even a temporary lapse in SI's websites and digital presence could have serious, negative repercussions on the value of the SI brand and the business's ability to maintain its audience and advertising revenues.

91.    By letter that same day, March 21, ABG demanded that Arena:

- "pay to [ABG] all outstanding amounts owed under the Agreement, including the following: (i) $45,000,000 USD, which became immediately due and payable to [ABG] upon termination, (ii) $3,750,000 USD, which became due and payable to [ABG] on January 1, 2024 (and remains outstanding), and (iii) all commission, vendor reimbursements, and other amounts that are due and payable to [ABG] (and remain outstanding), in each case plus interest";

- "immediately contact [Minute Media ("MM")] to arrange for the orderly transition of the Digital Channels to [ABG] (and MM, as designated by [ABG]), and the delivery to [ABG] (and MM, as designated by [ABG]) of all SI Content, Licensor Created Content and Licensee Created Content" (citing Licensing Agreement § 5(a)(iii));

- "deliver to [ABG] all documents, materials and other information relating to the SI Licensed Businesses in [Arena's] possession or control, including any Confidential Information of [ABG] and all Consumer Data";

- "immediately notify all third-party vendors to whom [Arena] provided Consumer Data that [ABG] (and MM, as designated by [ABG]) has the right to use such Consumer Data," and "take all necessary actions, consistent with current industry standards, to protect the confidentiality, integrity and security of the Consumer Data against any interruption, modification, or corruption, including the implementation of (i) data backup, (ii) disaster avoidance and recovery procedures, and (iii) business continuity procedures" (citing Licensing Agreement § 3(b)(ix));

- "immediately contact [ABG] to discuss communication to subscribers and users of the Magazines and Digital Channels" (citing Licensing Agreement § 3(b)(ix), (xi));

- "immediately either withdraw … or assign to [ABG] all right, title, and interest in and to all

trademark and other filings made by [Arena] for 'FanNation,' including without limitation, U.S. Trademark Application Nos. 97489673 and 97489669, and any registrations obtained for the same," which "constitute breaches by [Arena] of Sec. 4(f) of the Agreement" (citing Licensing Agreement. §§ 4(f), 5(a)(iii)); and

- "immediately deliver to [ABG] the Statements for the third (3rd) and fourth (4th) Contract Quarters of the 2023 Contract Year (which were due within thirty (30) days following the end of each such Contract Quarter but have not been delivered to date" (citing Licensing Agreement. § 7(e)).

Exhibit 9 ("Mar. 21, 2024 Demand Ltr.").

92.    Defendants ignored ABG's instructions and followed through on Bhargava's threat to "go nuclear." Arena began redirecting SI URLs to its own competing websites, including Athlon Sports, which included full copies of certain SI Content. The timing of this action—right at the beginning of the NCAA men's and women's basketball tournaments, a particularly busy time for sports news outlets—shows Arena's deliberate and unlawful torpedoing of SI's web traffic and Google rankings to the benefit of Arena's own properties. And, on information and belief, Defendants instructed Arena employees to contact third-party vendors in possession of ABG's intellectual property and consumer data, including Quad and CDS, to demand that they withhold that information from ABG or Minute Media, or destroy it. These actions risked subscribers not receiving print magazines and the loss and destruction of SI Content.

93.    On the very same day that Bhargava decided to "go nuclear," major media outlets reported that he is under investigation by the Senate Committee on Finance for hiding hundreds of millions of dollars in foreign bank accounts to evade taxes, and that he has been doing so for 15 years.

94.    To help mitigate the damage to the SI brand and business and prevent the loss of consumers who regularly visit and trust si.com and related websites, ABG immediately updated the Domain Name System ("DNS") of the si.com and certain SI-related domains—which ABG owns

and which Arena was only entitled to use during the term of the Licensing Agreement—to point to the Minute Media servers, which served the "static" versions of those sites reflecting SI Content. The static versions were designed to preserve domain authority and traffic but were not capable of serving advertisements or facilitating the publishing of content in the same way that the type of "dynamic" site previously operated by Arena would allow. As a result, the SI-related websites could not generate revenue for a period of time, and the advertising technology stack was not fully operational until May 8, 2024, causing further damage to the SI brand and business.

      **F.**     **Defendants Steal and Infringe ABG's Intellectual Property**

95.     Not content with simply interfering with ABG's contracts and efforts to mitigate the damage caused by Defendants, and intent on affiliating the longstanding and respected SI brand with Bhargava's toxic image and businesses, Defendants put into action the next phase of their "nuclear" scheme: direct competition by continuing to unlawfully use SI's intellectual property and other assets, all done, on information and belief, at Bhargava's instruction.

96.     On March 21, 2024, Arena copied over SI Content and Licensee Created Content—to which Defendants have no rights—directly to their competing websites, including Athlon Sports. The websites became effectively mirror images of the SI websites, in terms of content.

97.     Even worse, Arena copied over content from SI print magazines that was under copyright registration.

98.     For example, ABG has registered the content of the Sports Illustrated April 2020 issue Volume 131, No. 4 (Copyright Registration No. TX0009026524, registered Nov. 12, 2020, and together with other such registered content; the "Registered Magazines"). *See* <u>Exhibit 10</u>. That issue included an article entitled "Former NBA Player Royce White Takes on MMA." *See id.*

99.     On information and belief, Defendants willfully and without consent copied the content from the Registered Magazines and placed it on their competing website at Athlon.com.

*See* <u>Exhibit 11</u>.   The page hosting the stolen article contains advertisements from which, upon information and belief, Defendants are improperly deriving revenue.[29]   In stealing ABG's copyrighted materials, Defendants rob ABG of its valuable and proprietary creative expression and have violated ABG's right to the exclusive use of its creative products.

100.    In copying SI Content and Licensee Created Content that is owned by ABG under the clear terms of the Licensing Agreement, Defendants also willfully and unlawfully continued to use ABG's SI-related trademarks.   For example, as recently as March 23, 2024, Defendants unlawfully and without consent used the well-known "SI" logo belonging to ABG.



101.    The "SI" mark has been in use for decades and is nationally recognized and affiliated with Sports Illustrated by the public.   ABG is the owner of dozens of SI-related marks, including "SI." (Registration No. 6835333). The famous "SI" mark contains distinct design

---

[29] Defendants have infringed the copyrights of at least thousands of other articles, photos, and additional content. Plaintiffs are currently registering those copyrights, which will be the subject of forthcoming claims.

elements that are closely associated with and used interchangeably with "Sports Illustrated" itself, which is also a registered trademark (Registration No. 7305690).

102. Sports Illustrated has made use of the "SI" mark for decades in interstate commerce in connection with its publishing of sports, entertainment, health, and lifestyle content, among other things.

103. Defendants have also unlawfully and without consent exploited ABG's "Esports Illustrated" mark on their competing website, Athlon, further wrongfully associating SI with Defendants' websites.



104. "Esports Illustrated" has been used for several years by SI in connection with "electronic sports," or the competitive world of video gaming. The mark is similar in design and content to the registered and nationally recognized "Sports Illustrated" mark, and is associated by the public with Sports Illustrated brand and content.

105. Defendants have willfully and without consent infringed on the "SI" and "Esports Illustrated" marks, among others, by placing them on their directly competing website at Athlon.com. The use of these marks on Defendants' websites creates clear customer confusion that Athlon is connected to, associated with, or otherwise authorized by, Sports Illustrated. That

confusion is exacerbated by Defendants' prior—but now terminated—authorization to use the mark.

106.    The unauthorized use of the "SI" and "Esports Illustrated" marks, as well as the SI Content and Licensee Created Content (all owned by ABG-SI), has caused consumer confusion, particularly as Athlon is a direct competitor of si.com, and has unlawfully deprived ABG and Minute Media of related advertising revenue.  Defendants' actions are particularly damaging as they have come at a transitional moment, when ABG's new partner has been attempting to salvage the SI brand and Defendants have unlawfully attempted to create competing products through the infringement of ABG's protected intellectual property.

107.    Moreover, Arena's unauthorized duplication of SI Content, Licensee Created Content, and related SI marks creates a serious risk to SEO connected to si.com and its subdomains. The existence of duplicate content on several websites can negatively impact rankings on search engines, including Google, which may begin to index the copycat sites when they determine appropriate search results.  That, in turn, can further damage ABG's (and now Minute Media's) attempts to revive SI from the harm wrought by Defendants, including by undermining efforts to secure advertisers and the prices they are able to charge.

108.    As outrageous and unlawful as these actions are, Defendants did not stop there. Even as they have stolen SI's intellectual property and assets to prop up their own rival sites, and in order to further undermine the SI brand and business, Defendants have also sought to hijack ABG's popular "FanNation" properties, a network of over 150 publishers and writers dedicated to providing comprehensive, hyper-local coverage across a wide range of sports, including college and high school athletics, MLB, NBA, and NFL teams, as well as topics such as gambling and collectibles.

109.    Prior to termination of the Licensing Agreement, Arena onboarded FanNation publishers as independent contractors.  These agreements, which were not provided to ABG for advance approval as required by Section 4(c) of the Licensing Agreement, state that each publisher is the owner of its content, but that Arena would retain a license to host the content on the SI domains.  This structure is in clear breach of Section 5(a) of the Licensing Agreement, which states that ABG is "the sole owner and [has] all right, title and interest in and to" all media content related to the SI magazines and digital channels then in existence or subsequently created by ABG, Arena, or third parties acting on their behalf.  *Id.* § 5(a)(i)-(iii).

110.    On information and belief, Defendants have continued to engage in negotiations with FanNation writers and stakeholders to contract with Arena and affiliate themselves with Arena websites, such as Athlon Sports and TheSpun, going forward, rather than with SI.  As part of those negotiations, Defendants have cited Arena's July 2022 PTO application to register the "FanNation" trademark.  *See* U.S. Trademark Application Nos. 97489673 and 9748669.  That application, however, was improper because ABG already owns the trademark to FanNation, as well as the domain name "fannation.com."

111.    Under Section 4(f) of the Licensing Agreement, as noted above, Arena agreed that it would not "directly or indirectly, apply for, or obtain, or assist any Person in applying for or obtaining any registration of or related to (i) any SI Trademark, or any trademark, service mark, trade name, or other indicia confusingly similar to any SI Trademark in any country… ."  As the fannation.com domain was among the domains licensed to Arena under the Licensing Agreement, and the FanNation sites were all on si.com (si.com/fannation), they are Digital Channels under the Licensing Agreement.  *See* Licensing Agreement § 1(n), Sched. A.

112.    ABG acquired the rights in and to the FanNation mark from its predecessor in interest, TI Gotham, Inc., pursuant to an Asset Purchase Agreement and Intellectual Property Assignment Agreement, each dated May 24, 2019.  ABG is the owner of the FanNation mark in connection with publication of sports and entertainment content, among other things. Consumers associate the FanNation mark with Sports Illustrated through its continual and widespread use over the past decade.  That association continues to this day:



113.    ABG-SI has filed a letter of protest with the PTO with respect to Defendants' unlawful and invalid registration of the FanNation mark, and, on March 21, 2024, filed an application for mark.  *See* Exhibits 12-13.

114.    In addition, Defendants, including Bhargava, have attempted to make use of the FanNation mark following termination of the Licensing Agreement, in further violation of Section 4(f) of the Licensing Agreement.   For example, Defendants unlawfully and without consent continue to use the FanNation marks on Athlon.com:



115.    The unlawful infringement of the "FanNation" mark causes additional consumer confusion, wrongfully associating FanNation with Defendants' competing businesses.  As with their other litany of wrongful and destructive acts, it damages the SI brand and business.

**G.    Bhargava Dominated and Controlled Arena to Wrongfully Injure Plaintiffs**

116.    Under the guise of merging Arena with Bhargava-owned Bridge Media (in order to acquire a media company to promote his 5-hour ENERGY and other businesses), Bhargava exercised significant control over Arena's operations, including (as described above) unbridled discretion in terminating Arena executives and SI's unionized staff, as well as in following through on his threat to "go nuclear" and causing Arena's breach of the Licensing Agreement.

117.    Bhargava began by acquiring Arena debt and equity through his controlled company Simplify before entering into a binding letter of intent with Arena in August 2023, and a definitive merger agreement in November 2023, that allowed him to (among other things) exercise

authority and control over Arena by unilaterally directing the company's affairs and disregarding corporate formalities; as one of his former associates put it, "[e]verything [ran] through Manoj."

118.    Bhargava dominated Arena and took actions that drove down its share price to his own advantage, despite not being an officer or director of the company (until he appointed himself interim CEO for two and a half weeks on December 11, 2023).  These actions include breaching the Licensing Agreement and forcing its termination in January 2024, terminating Arena executives and SI's unionized staff, splashing 5-hour ENERGY ads on SI web pages, and stealing Plaintiffs' intellectual property following the Licensing Agreement's termination.  At Bhargava's direction, Arena failed to pay the Quarterly Payment and breached the Licensing Agreement, which triggered the contractually bargained-for and mandated termination fee of $45 million payable to ABG.

119.    Rather than maintain formal management barriers between himself and Arena (a public company), Bhargava ratified these actions after the fact by bringing in his cronies to serve as Arena directors and executives to bless his past misconduct.

120.    Arena's share price fell precipitously and stagnated as a result of Bhargava's actions, losing more than two-thirds of its value.  The closing price was $3.38 per share on August 14, 2023, the date that Arena and Simplify signed the binding letter of intent to merge, and it closed as high as $4.39 per share a few days later.  But the stock has traded for less than $3.00 per share—and at times less than $1.00 per share—since January 2024, and is currently trading around $1.50 per share.

121.    Causing the value of Arena's stock to fall so substantially allowed Bhargava to acquire more equity in Arena on the cheap and to convert the more than $15 million of Arena debt

he held through Simplify into equity.  He also brought in allies like Renew, on whom he relies for funding for his businesses, to invest in Arena on the cheap alongside him.

122.    In August 2024, Bhargava caused Bridge Media, his controlled company that was supposed to merge with Arena pursuant to the 2023 merger agreement, to shut down operations and fire substantially all of its employees.  He then caused Arena to terminate the merger agreement. Bhargava thus once again utilized his absolute control over Arena to free himself of the obligation to complete a merger—which he had previously used to exercise de facto control—and was able to obtain majority ownership of Arena more cheaply through purchasing additional shares at depressed prices.

123.    All the while, Bhargava has engaged in self-dealing and sweetheart deals, using Arena to benefit his other businesses by, among other things, controlling the flow of funds into and out of the company.  On information and belief, he caused Arena to enter into an agreement under which Arena would provide advertising for 5-hour ENERGY on Arena websites at discounted rates. Bhargava thus received discounted advertising from Arena and deprived the company of substantial revenue.  And he caused Arena to sublease prime Park Avenue office space and pay premium rent to one of his other companies, thereby siphoning funds from Arena.

124.    Bhargava's actions have left Arena undercapitalized in the process.  In its November 2024 10-Q, Arena reported that it "incurred a net loss from continuing operations of $14,880[,000], and as of September 30, 2024, had … a working capital deficit of $209,596[,000]." Exhibit 14 at 11 ("November 14, 2024 Form 10-Q").[30]  Arena reported again that "there is

---

[30] Exhibit 14 excludes the voluminous attachments to the November 14, 2024 Form 10-Q that are irrelevant here.

substantial doubt about the Company's ability to continue as a going concern" for the coming year, "due to the net loss from continued operations and working capital deficit." *Id.*

125.    Arena's financial difficulties are reflected in and have been exacerbated by frequent turnover in key roles.  Bhargava terminated key Arena executives, including then-CEO Levinsohn and then-COO Andrew Kraft, at the end of 2023—but he has not stopped there.  As noted, Bhargava became Arena's interim CEO for about two and a half weeks before stepping down and leaving the position vacant, until Cavitt Randall became CEO on February 13, 2024.  But Randall then resigned on April 19, 2024, when Sara Silverstein took over after serving as Arena's General Manager-Finance.  Silverstein lasted fewer than ten months before she was terminated on February 12, 2025, and Arena named Paul Edmondson, who previously served as Arena's President-Platform, as CEO.

126.    Arena's undercapitalization is especially concerning given how Bhargava generally runs his companies.  For instance, Bhargava periodically engages in what his associates describe as "the January Shuffle," a practice where Bhargava exercises complete control over the assets of various closely held companies and reallocates or shifts such assets as he desires.  On information and belief, Bhargava's exercise of unbridled control and discretion, co-mingling and siphoning of funds, and self-dealing permits Bhargava to enrich himself while depriving companies like Arena of operating capital and making them judgment proof.  Should Plaintiffs prevail here, there is substantial doubt as to Arena's ability to pay the minimum amount it owes under the Licensing Agreement, let alone any additional damages, especially given the company's repeated warnings about its "ability to continue as a going concern … due to net losses and working capital deficit." *Id*.

127.    This is not a theoretical harm or injustice against Plaintiffs; on October 2, 2024, Arena received notice from the New York Stock Exchange ("NYSE") that it was at risk of being

delisted because it was out of compliance with NYSE's minimum stockholders' equity requirements, in particular that a company have stockholders equity of $6.0 million or more if the company has reported losses from continuing operations and/or net losses in its five most recent fiscal years. Arena subsequently submitted a plan for complying with the NYSE requirements. While NYSE accepted Arena's compliance plan on December 20, 2024, Arena's ability to successfully execute its plan while under Bhargava's domination and control is far from certain. Moreover, Arena has reported losses in its five most recent fiscal years and reported that as of June 30, 2024, it had a stockholders' deficit of $157.2 million. *Id*. at 49.

128.    As these facts show, Bhargava exercised complete dominion and unfettered domination and control over Arena during the period when Arena repeatedly injured ABG through its contractual breaches and other tortious and unlawful conduct, and with respect to each of the transactions at issue. From terminating key executives and SI's unionized staff, and gutting editorial standards, to dictating financial decisions and the misappropriation and theft of ABG's intellectual property, Bhargava directed every critical decision made by Arena—including its decision to breach the Licensing Agreement, its failure to transfer SI assets, its current undercapitalization, and its other actions (as alleged in this complaint) that harmed the SI brand and business. Bhargava clearly used his domination and control of Arena to commit the injuries against Plaintiffs that are the subject of this litigation.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract – Missed Quarterly Payment
**By Plaintiff ABG-SI Against Defendants Arena and Bhargava**

129.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

130.    Under New York law, the elements of a claim for breach of contract are (1) the

existence of a contract; (2) plaintiff's performance in accordance with the contract; (3) defendant's breach of its obligations under the contract; and (4) damages resulting from defendant's breach. *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).

131.    The Licensing Agreement is an enforceable contract between ABG-SI and Arena.

132.    ABG-SI has fully performed in accordance with the Licensing Agreement.

133.    Arena breached the Licensing Agreement by failing to make the $3.75 million Quarterly Payment due on January 2, 2024, as required under Section 7(a)(i).

134.    Bhargava, as the controlling shareholder who wrongfully used his domination of Arena to cause it to breach the Licensing Agreement, is also liable for such breach.

135.    ABG-SI is entitled to damages resulting from Arena and Bhargava's breach of Section 7(a)(i) in the amount of the $3.75 million, the sum of the missed Quarterly Payment.

## COUNT II
## <u>Breach of Contract –Termination Payment</u>
### By Plaintiff ABG-SI Against Defendants Arena and Bhargava

136.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

137.    Under New York law, the elements of a claim for breach of contract are (1) the existence of a contract; (2) plaintiff's performance in accordance with the contract; (3) defendant's breach of its obligations under the contract; and (4) damages resulting from defendant's breach. *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).

138.    The Licensing Agreement is an enforceable contract between ABG-SI and Arena.

139.    ABG-SI has fully performed in accordance with the Licensing Agreement.

140.    On January 18, 2024, ABG-SI validly terminated the Licensing Agreement.

141.    Arena has failed to pay the Termination Payment of $45 million, in breach of Section 10(g)(ii) of the Licensing Agreement.

142.    Bhargava, as the controlling shareholder who wrongfully used his domination of Arena to cause it to breach the Licensing Agreement, is also liable for such breach.

143.    ABG-SI is entitled to damages resulting from Arena's and Bhargava's breach of Section 10(g)(ii) in the amount of $45 million, the Termination Payment.

**COUNT III**
**<u>Breach of Contract – Unpaid Commissions and Other Royalties</u>**
**By Plaintiff ABG-SI Against Defendants Arena and Bhargava**

144.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

145.    Under New York law, the elements of a claim for breach of contract are (1) the existence of a contract; (2) plaintiff's performance in accordance with the contract; (3) defendant's breach of its obligations under the contract; and (4) damages resulting from defendant's breach. *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).

146.    The Licensing Agreement is an enforceable contract between ABG-SI and Arena.

147.    ABG-SI has fully performed in accordance with the Licensing Agreement.

148.    Under Sections 7(d) and 7(e), Arena was required to deliver to ABG-SI quarterly statements within 30 days following the end of each Contract Quarter, detailing, among other things, "any commissions payable pursuant to this Agreement," and to pay all commissions due within 30 days following the end of each Contract Quarter.

149.    Arena has failed to provide ABG-SI with the quarterly statements for the third and fourth quarters of 2023 or to pay ABG-SI the commissions due for those quarters, in breach of Sections 7(d) and 7(e), and notwithstanding ABG-SI's repeated demands for the same.

150.    Upon information and belief, those unreported quarterly statements would have revealed at least $3 million in unpaid commissions and earned royalties.

151.    Bhargava, as the controlling shareholder who wrongfully used his domination of

Arena to cause it to breach the Licensing Agreement, is also liable for such breach.

152.    ABG-SI is entitled to damages resulting from Arena and Bhargava's breach of Sections 7(d) and 7(e) in an amount to be determined at trial.

**COUNT IV**
**<u>Breach of Contract – Brand Damage</u>**
**By Plaintiff ABG-SI Against Defendants Arena and Bhargava**

153.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

154.    Under New York law, the elements of a claim for breach of contract are (1) the existence of a contract; (2) plaintiff's performance in accordance with the contract; (3) defendant's breach of its obligations under the contract; and (4) damages resulting from defendant's breach. *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).

155.    The Licensing Agreement is an enforceable contract between ABG-SI and Arena.

156.    ABG-SI has fully performed in accordance with the Licensing Agreement.

157.    Arena breached Sections 4(d) and 4(e) of the Licensing Agreement by taking actions to harm, tarnish, or devalue the value of SI's brand rights, as well as continuing to improperly and without authorization use ABG-SI's content, trademarks, and other intellectual property without license following the termination of the Licensing Agreement.

158.    These breaches of the Licensing Agreement have caused substantial damages to ABG-SI through the diminution of SI's brand value.

159.    Bhargava, as the controlling shareholder who wrongfully used his domination of Arena to cause it to breach the Licensing Agreement, is also liable for such breach.

160.    ABG-SI is entitled to damages resulting from Arena and Bhargava's breach of Section 4(d) and 4(e) in an amount to be determined at trial.

**COUNT V**
**Breach of Contract – Interference with Ownership Rights**
**By Plaintiff ABG-SI Against Defendants Arena and Bhargava**

161.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

162.    Under New York law, the elements of a claim for breach of contract are (1) the existence of a contract; (2) plaintiff's performance in accordance with the contract; (3) defendant's breach of its obligations under the contract; and (4) damages resulting from defendant's breach. *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).

163.    The Licensing Agreement is an enforceable contract between ABG-SI and Arena.

164.    ABG-SI has fully performed in accordance with the Licensing Agreement.

165.    Arena breached Section 5 of the Licensing Agreement by taking actions inconsistent with the ownership rights of ABG-SI in the SI Content, Licensee Created Content, Consumer Data, and other SI assets, which Arena has continued to use without a license following the termination of the Licensing Agreement and without authorization from ABG-SI.

166.    Arena further breached Section 5 by failing to promptly take such actions as reasonably necessary to cooperate with ABG-SI's efforts to "obtain, maintain, protect, and/or vest in" ABG-SI ownership of such rights and title.

167.    Bhargava, as the controlling shareholder who wrongfully used his domination of Arena to cause it to breach the Licensing Agreement, is also liable for such breach.

168.    Arena's and Bhargava's breach occurred both during the term of the Licensing Agreement and after its termination on January 18, 2024.

169.    ABG-SI is entitled to damages resulting from Arena's and Bhargava's breach of Section 5 in an amount to be determined at trial, as well as an injunction preventing Arena and

Bhargava from continuing to interfere with ABG-SI's ownership rights and requiring them to cooperate in ABG-SI obtaining, maintaining, protecting, and vesting such rights.

### COUNT VI
### Breach of Contract – Unlawful Registration of Mark
### By Plaintiff ABG-SI Against Defendants Arena and Bhargva

170.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

171.    Under New York law, the elements of a claim for breach of contract are (1) the existence of a contract; (2) plaintiff's performance in accordance with the contract; (3) defendant's breach of its obligations under the contract; and (4) damages resulting from defendant's breach. *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).

172.    The Licensing Agreement is an enforceable contract between ABG-SI and Arena.

173.    ABG-SI has fully performed in accordance with the Licensing Agreement.

174.    Section 4(f) of the Licensing Agreement provides that "Licensee agrees that it shall not, directly or indirectly, apply for, or obtain, or assist any Person in applying for or obtaining any registration of or related to (i) any SI Trademark, or any trademark, service mark, trade name, or other indicia confusingly similar to any SI Trademark in any country…"

175.    As part of its ownership of the SI trademarks, ABG owns a common law trademark to FanNation.

176.    In addition, ABG owns the fannation.com domain name and si.com/fannation Digital Channel.

177.    Arena breached Section 4(f) of the Licensing Agreement when Arena filed with the United States Patent and Trademark Office applications to register a trademark for "FanNation." *See* U.S. Trademark Application Nos. 97489673 and 9748669.

178.    Bhargava, as the controlling shareholder who wrongfully used his domination of Arena to cause it to breach the Licensing Agreement, is also liable for such breach.

179.    ABG-SI is entitled to damages resulting from Arena's and Bhargava's breach of Section 4(f) in an amount to be determined at trial, as well as an injunction requiring Arena and Bhargava to withdraw Arena's improper trademark application, which was made in violation of Section 4(f).

**COUNT VII**
**Breach of Contract – Implied Covenant of Good Faith and Fair Dealing**
**By Plaintiff ABG-SI Against Defendants Arena and Bhargava**

180.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

181.    Under New York law, every contract contains an implied covenant of good faith and fair dealing. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995).

182.    The implied covenant of good faith "encompasses 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the agreement, and prohibits either party from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *110 Indus. Assocs., LLC v. Trim Corp. of Am.*, 297 A.D.2d 630, 631 (2d Dept. 2002).

183.    The Licensing Agreement is an enforceable contract between ABG-SI and Arena.

184.    By agreeing to the Licensing Agreement, Arena was bound to abide by the implied covenant of good faith and fair dealing in its performance of the Licensing Agreement with ABG-SI.

185.    Arena's obligations to not tarnish or damage SI and the SI brand continued after the January 18, 2024 termination of the Licensing Agreement.

186.    A reasonable person in the position of ABG-SI would be justified in understanding that, in agreeing to the Licensing Agreement, Arena agreed to run SI in a manner consistent with SI's legacy of producing high-quality sports journalism and would not take actions to destroy SI's ability to continue doing so into the future.

187.    Arena breached the implied covenant of good faith and fair dealing by intentionally and materially breaching the Licensing Agreement, taking actions to harm the SI brand and business, and refusing to comply with its post-termination obligations.

188.    Bhargava, as the controlling shareholder who wrongfully used his domination of Arena to cause it to breach the implied covenant of good faith and fair dealing, is also liable for such breach.

189.    Arena's and Bhargava's breach of the implied covenant of good faith and fair dealing occurred both during the term of the Licensing Agreement and after its termination on January 18, 2024.

190.    ABG-SI is entitled to damages resulting from Defendants' breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

### COUNT VIII
### Piercing the Corporate Veil / Alter Ego Liability
### By Plaintiff ABG-SI Against Defendant Bhargava

191.    ABG-SI realleges and incorporates all allegations in the Complaint, as if set forth fully herein.

192.    Defendant Bhargava has disregarded corporate formalities with respect to Arena and so completely dominated and/or exercised such a high degree of control over Arena that the Court should pierce the corporate veil between Arena and Bhargava, and as necessary his fully controlled corporate entities, or find that Arena is the mere alter ego of Bhargava.

193.    Among other things, Bhargava assumed control of Arena in the fall of 2023 and, before he had any formal role or title, used the company for his own personal means, including to benefit his other companies and products, and exercised control over the company's employees and the SI business.

194.    Bhargava also ensured that he would have control by directing the head of Human Resources to terminate Arena's Operations President and Chief Operating Officer, Media President, and General Counsel, and then installing himself as interim CEO, even though he had no authority to do either.

195.    According to former Bhargava associates, "everything runs through Manoj [Bhargava]" and other executives and directors cannot make decisions without Bhargava's blessing.

196.    Bhargava specifically exercised his control over Arena to cause the company to fail to make the $3.75 million Quarterly Payment due on January 2, 2024, and the other earned royalties and commissions due for Q4 2023 and Q1 2024, in furtherance of his personal aim to create a pretext to terminate Arena's SI unionized employees.  Bhargava also caused Arena to fail to make the $45 million Termination Payment, in furtherance of his personal aim to force ABG to renegotiate the Licensing Agreement's terms.  Bhargava took these actions when he was a substantial minority shareholder and, as of November 2023, the owner of all of Arena's debt.

197.    In addition to abusing corporate formalities, Bhargava represented that Arena was unable to pay amounts due to ABG because it was undercapitalized, a statement borne out by Arena's recent SEC filings in which Arena has stated that there is "substantial doubt" about its ability to continue as a going concern in the coming year unless it can renegotiate its debt, which is on information and belief held entirely or otherwise overwhelmingly by Bhargava.

198.     Bhargava periodically engages in what his former associates describe as "the January Shuffle," a practice where Bhargava exercises complete control over the assets of various closely held companies and reallocates or shifts such assets as he desires.  On information and belief, Bhargava's exercise of unbridled control and discretion, co-mingling and siphoning of funds, and self-dealing permits him to enrich himself while depriving companies like Arena of operating capital and making them judgment proof.

199.     Bhargava gained majority shareholder status in February 2024.  Afterwards, he continued to exercise control over Arena's operations, to the benefit of himself and his other businesses and without regard to corporate formalities.  Bhargava caused Arena to splash 5-hour ENERGY ads on SI web pages and to pay premium rent to another of his closely held companies, and took actions to drive down Arena's stock price so he could acquire more equity on the cheap.

200.     In March 2024, Bhargava caused Arena to fail to comply with its obligations under the Licensing Agreement concerning the transfer of the SI licensed business, demanded a $50 million payment, and threatened to and caused Arena to "go nuclear" by trying to torpedo the SI business and websites.  On information and belief, these actions were further undertaken by Bhargava, and at his direction, as part of his ongoing efforts to force ABG to rewrite the terms of the Licensing Agreement to his personal benefit.  Bhargava's actions were, as the former CEO recognized, in furtherance of Bhargava's self-dealing.

201.     Bhargava, as the controlling shareholder who wrongfully used his domination of Arena to cause it to breach Arena's obligations, is also liable for such breaches of contract.

202.     Bhargava's actions were done in order to perpetrate an injustice, including but not limited to his apparent violation of labor laws, his interference with ABG's contract with Minute Media, and his wholesale theft of ABG's property rights.

203.    ABG-SI is entitled to damages resulting from Defendants' breaches in an amount to be determined at trial.

**COUNT IX**
**Tortious Interference**
**By Plaintiff ABG-SI Against Defendants Arena and Bhargava**

204.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

205.    Under New York law, a claim for tortious interference with economic relations must allege "(1) a valid contract or prospective contractual relationship, (2) defendant's knowledge of such relationship, (3) intent to interfere, and (4) damages." *P. Kaufmann, Inc. v. Americraft Fabrics, Inc.*, 198 F. Supp. 2d 466, 472 (S.D.N.Y. 2002).

206.    On March 17, 2024, ABG-SI entered into a valid agreement with Minute Media to license SI's brand rights and continue the publication and distribution of SI.  Under the agreement, Minute Media became entitled to any and all rights Arena had from the moment it entered into the Licensing Agreement, through the termination and replacement of Arena with Minute Media on March 17.

207.    Defendants were aware of ABG-SI's agreement with Minute Media no later than March 18, 2024.

208.    Defendants intentionally and without permissible justification sought to procure the breach of ABG-SI's agreement with Minute Media by at least the following actions:

    a.  refusing to turn over ABG-SI's licensed property, including SI Content, Licensee Created Content, Consumer Data, and Subscriber Funds, to Minute Media and impeding Minute Media's attempts to make use of that property;

    b.  refusing to provide Minute Media with content and other information belonging to ABG and now licensed to Minute Media (and to which Defendants no longer

51

have any rights) including SI subscriber lists, advertiser information, and third-party vendor contracts;

c.  demanding a $50 million ransom to cooperate with the transition to Minute Media and threatening to shut down SI's operations if they were not paid;

d.  unlawfully contacting third party vendors in possession of ABG's intellectual property, like Consumer Data, and instructing them to withhold that information with ABG or Minute Media, or destroy it;

e.  improperly diverting or shutting down Arena's hosted, "dynamic" versions of ABG's websites, such as si.com;

f.  refusing to provide or return to ABG information related to SI's advertisers; and

g.  copying SI Content and Licensee Created Content—to which Defendants had no rights following termination of the Licensing Agreement, as stated above—directly to Arena owned websites, in particular Athlon, and thereby interfering with SI's SEO rankings and potentially affecting revenues.

209.  Defendants' improper actions caused ABG-SI to work together with Minute Media to stand up "static" versions of the si.com and the other SI websites that Defendants had improperly diverted or shut down.  The static websites, however, did not contain any advertisements, and as Defendants have refused to provide or return to ABG-SI information related to those advertisers, the websites generated no revenue, further damaging the SI brand and business and thus potentially reducing ABG-SI's royalty, commissions, and other revenues due under its agreement with Minute Media.  As a result of Defendants' improper actions, Minute Media was unable to fulfill the

requirement in its licensing agreement with ABG-SI that Minute Media must maintain Digital Channels with respect to functionality.

210.    Defendant Bhargava also intentionally and without permissible justification sought to procure the breach of the Licensing Agreement between ABG-SI and Arena by at least the following actions:

    a.  terminating Arena's executives and SI's unionized staff;

    b.  causing Arena to miss the Quarterly Payment that was due to Plaintiffs on January 2, 2024;

    c.  refusing to provide Minute Media with content and other information belonging to ABG and now licensed to Minute Media (and to which Defendants no longer have any rights) including SI subscriber lists, advertiser information, and third-party vendor contracts;

    d.  demanding a $50 million ransom to cooperate with the transition to Minute Media and threatening to shut down SI's operations if the ransom was not paid;

    e.  unlawfully contacting third party vendors in possession of ABG's intellectual property, like Consumer Data, and instructing them to withhold that information from ABG or Minute Media, or destroy it;

    f.  improperly diverting or shutting down Arena's hosted, "dynamic" versions of ABG's websites, such as si.com;

    g.  refusing to provide or return to ABG information related to SI's advertisers; and

    h.  copying SI Content and Licensee Created Content—to which Defendants had no rights following termination of the Licensing Agreement, as stated above—

directly to Arena owned websites, in particular Athlon, and thereby interfering with SI's SEO rankings and potentially affecting revenues.

211.    Defendant Bhargava's improper actions have deprived Plaintiffs of the Quarterly Payment and other payments owed under the Licensing Agreement, and caused them to have to find and enter into an agreement with another partner to publish SI, and to work together with Minute Media to stand up "static" versions of the si.com and the other SI websites that Defendants had improperly diverted or shut down.  The static websites, however, did not contain any advertisements, and as Defendants have refused to provide or return to ABG-SI information related to those advertisers, the websites generated no revenue, further damaging the SI brand and business and thus potentially reducing ABG-SI's royalty, commissions, and other revenues due under its agreement with Minute Media.  As a result of Defendants' actions, Arena breached the Licensing Agreement in the ways described in Counts I–VII.

212.    As a result of Defendants' actions, ABG-SI has sustained and continues to sustain significant damages and is entitled to damages in an amount to be determined at trial, as well as an injunction requiring Defendants to cease the foregoing actions and to comply with ABG-SI's requests for the SI assets.

**COUNT X**
**Conversion**
**By Plaintiff ABG-SI Against Defendants Arena and Bhargava**

213.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

214.    Under New York law, "[t]o establish a cause of action to recover damages for conversion, a plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion

over the thing in question to the exclusion of the plaintiff's rights." *Halvatzis v. Perrone*, 156 N.Y.S.3d 428, 430 (2d Dept. 2021).

215.    Pursuant to the Licensing Agreement, Section 2 ("SI Licensed Operations"), Section 3 ("Operation of SI Licensed Businesses"), Section 4 ("License and Content Use"), and Section 5 ("Ownership Rights"), ABG-SI owns and has all right, title, and interest in and to the SI editorial and media content, trademarks, and other intellectual property, and materials related to the SI Licensed Businesses, including Consumer Data.

216.    The Licensing Agreement provided Arena and Bhargava a limited license to use certain of those rights, but those rights terminated with termination of the Licensing Agreement.

217.    On January 18, 2024, ABG-SI validly terminated the Licensing Agreement.

218.    Nonetheless, Arena and Bhargava have continued to use those rights unlawfully, without a license, and refused to return materials related to the SI Licensed Businesses, including Consumer Data, to ABG-SI, depriving ABG-SI of its sole ownership.

219.    ABG-SI is entitled to damages to compensate for Arena's and Bhargava's conversion of SI's brand rights, in an amount to be determined at trial.

## COUNT XI
### Copyright Infringement Pursuant to Copyright Act, 17 U.S.C. § 501
### By Plaintiff ABG-SI Against Defendant Arena

220.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

221.    "To prevail on a claim of copyright infringement, a plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108–09 (2d Cir. 2001).

222.    ABG-SI holds all right, title and interest in and to the copyrights of the Registered Magazines. Pursuant to 17 U.S.C. § 106, ABG-SI has the exclusive right to reproduce, distribute, display, and/or prepare derivative works from the Registered Magazines.

223.    By the actions alleged above, Arena has infringed and will continue to infringe ABG-SI's copyrights in each of the Registered Magazines by unlawfully reproducing, distributing, and displaying all or infringing portions of the Registered Magazines without the permission of ABG-SI on its websites in violation of ABG-SI's exclusive rights under 17 U.S.C. §§ 106 and 501.

224.    Arena's infringements were and are willful and committed with full knowledge and conscious disregard of ABG-SI's copyrights and exclusive rights in and to the Registered Magazines.

225.    Arena's infringements were and are conducted without ABG-SI's consent and are not otherwise permissible under the Copyright Act.

226.    ABG-SI is entitled to recover from Arena the profits made by it from infringements of the Registered Magazines and ABG-SI's damages therefrom, or, at ABG-SI's election, statutory damages pursuant to 17 U.S.C. § 504, as well as injunctive relief prohibiting Arena from infringing upon ABG's copyrighted material.

227.    ABG-SI is also entitled to recover from Arena costs and attorneys' fees pursuant to 17 U.S.C. § 505.

### COUNT XII
### Vicarious Copyright Infringement Pursuant to Copyright Act, 17 U.S.C. § 501
### By Plaintiff ABG-SI Against Defendant Bhargava

228.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

229.    By the actions alleged above, Arena has directly infringed and will continue to infringe ABG-SI's copyrights in and to the Registered Magazines.

230.    Bhargava enjoyed a direct financial benefit from Arena's infringing activities.

231.    Bhargava has the right and ability to supervise, control, and prevent Arena's infringing activity, but has failed or refused to exercise supervision or control over Arena's infringing activities.

232.    Bhargava's infringements were and are willful and committed with full knowledge and conscious disregard of ABG-SI's copyrights and exclusive rights in and to the Registered Magazines.

233.    ABG-SI is entitled to recover from Bhargava the profits made by Defendants from infringements of the Registered Magazines and ABG-SI's damages therefrom, or, at ABG-SI's election, statutory damages pursuant to 17 U.S.C. § 504, as well as injunctive relief prohibiting Arena from infringing upon ABG's copyrighted material.

234.    ABG-SI is also entitled to recover from Bhargava costs and attorneys' fees pursuant to 17 U.S.C. § 505.

**COUNT XIII**
**Contributory Copyright Infringement Pursuant to Copyright Act, 17 U.S.C. § 501**
**By Plaintiff ABG-SI Against Defendant Bhargava**

235.    ABG-SI realleges and incorporates all allegations in this Complaint, as if set forth fully herein.

236.    By the actions alleged above, Arena has directly infringed and will continue to infringe ABG-SI's copyrights in and to the Registered Magazine.

237.    By the actions alleged above and upon information and belief, Bhargava has induced, caused, assisted, or materially contributed to the infringing conduct of Arena.

238.    By the actions alleged above, Bhargava has provided the means for the infringing conduct of Arena.

239.    Bhargava knows or has reason to know of the actual or imminent infringing conduct of Arena.

240.    The infringements that Bhargava induced, caused, assisted, or materially contributed to through the conduct described above were without ABG-SI's consent and are not otherwise permissible under the Copyright Act.

241.    Bhargava's infringements were and are willful and committed with full knowledge and conscious disregard of ABG-SI's copyrights and exclusive rights in and to the Registered Magazines.

242.    ABG-SI is entitled to recover from Bhargava the profits made by Defendants from infringements of the Registered Magazines and ABG-SI's damages therefrom, or, at ABG-SI's election, statutory damages pursuant to 17 U.S.C. § 504, as well as injunctive relief prohibiting Arena from infringing upon ABG's copyrighted material.

243.    ABG-SI is also entitled to recover from Bhargava costs and attorneys' fees pursuant to 17 U.S.C. § 505.

## COUNT XIV
### Trademark Infringement Pursuant to 15 U.S.C. § 1114
#### By Plaintiff ABG-SI Against Defendant Arena

244.    Plaintiffs reallege and incorporate all allegations in this Complaint, as if set forth fully herein.

245.    To establish a claim for trademark infringement under the Lanham Act for a registered mark under 15 U.S.C. § 1114, a plaintiff must demonstrate that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale … or advertising of goods or services, (5) without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406–07 (2d Cir. 2005) (internal quotation marks and citation omitted).  The infringing use also must be "likely to cause

confusion with [plaintiff's] mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020).

246.    ABG owns the registered trademark associated with SI, which is entitled to protection under the Lanham Act.

247.    Arena has used the SI trademark in commerce in connection with the sale or advertising of goods or services by displaying the SI trademark on content hosted on and featured by Arena's own websites, in particular Athlon.

248.    Arena has intentionally used the SI trademark after the termination of the Licensing Agreement and without ABG's permission.

249.    Arena has intentionally used the SI trademark to cause confusion as to the affiliation, connection, or association of Arena with SI, and as to the origin, sponsorship, or approval of Arena's commercial activities by SI.  Arena's use of the SI trademark on its own websites confusingly associates Arena's content with ABG's content when Arena's license to use or create such content ended with the termination of the Licensing Agreement.

250.    Arena's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Plaintiffs' trademarks to the irreparable injury of ABG.

251.    Plaintiffs are entitled to recover profits and treble damages from Arena's intentional and egregious infringing use of the SI trademark, as well as injunctive relief prohibiting Arena from infringing upon ABG's rights to the SI trademark.

**COUNT XV**
**<u>Trademark Infringement Pursuant to Lanham Act, 15 U.S.C. § 1125</u>**
**By Plaintiffs Against Defendant Arena**

252.    Plaintiffs reallege and incorporate all allegations in this Complaint, as if set forth fully herein.

253.    To establish a claim for trademark infringement under the Lanham Act for an unregistered mark under 15 U.S.C. § 1125, a plaintiff must demonstrate that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale ... or advertising of goods or services, (5), without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406–07 (2d Cir. 2005) (internal quotation marks and citation omitted).  The infringing use also must be "likely to cause confusion with [plaintiff's] mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020).

254.    ABG owns the trademarks associated with "SI", "Esports Illustrated," and "FanNation" ("Plaintiffs' Marks"), which are entitled to protection under the Lanham Act.

255.    Arena has used Plaintiffs' Marks in commerce in connection with the sale or advertising of goods or services by displaying Plaintiffs' Marks on content hosted on and featured by Arena's own websites, in particular Athlon.

256.    Arena has intentionally used Plaintiffs' Marks after the termination of the Licensing Agreement and without ABG's permission.

257.    Arena has intentionally used Plaintiffs' Marks to cause confusion as to the affiliation, connection, or association of Arena with SI and FanNation, and as to the origin, sponsorship, or approval of Arena's commercial activities by SI.  Arena's use of Plaintiffs' Marks on its own websites confusingly associates Arena's content with ABG's content when Arena's license to use or create such content ended with the termination of the Licensing Agreement.

258.    Arena's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with the Plaintiffs' Marks to the irreparable injury of ABG.

259.    Plaintiffs are entitled to recover profits and damages from Arena's intentional infringing use of Plaintiffs' Marks, as well as injunctive relief prohibiting Arena from infringing upon ABG's rights to Plaintiffs' Marks.

**COUNT XVI**
**Trademark Infringement**
**By Plaintiffs Against Defendant Bhargava**

260.    Plaintiffs reallege and incorporate all allegations in this Complaint, as if set forth fully herein.

261.    By the actions alleged above, Arena has directly infringed and will continue to infringe Plaintiffs' Marks.

262.    Individuals are liable for infringement where they are "a 'moving, active, conscious force' behind the trademark infringement." *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 383 (S.D.N.Y. 2015) (citation omitted).

263.    Bhargava was the moving, active, conscious forces behind Arena's infringing activity as they authorized and approved the underlying infringement.

264.    Plaintiffs are entitled to recover profits and damages from Bhargava's intentional infringing use of Plaintiffs' Marks, as well as injunctive relief prohibiting Bhargava from infringing upon ABG's rights to Plaintiffs' Marks.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

i.    Award damages in favor of Plaintiffs in an amount to be determined at trial, but not less than $48.75 million, and including statutory and trebled damages for Defendants' infringement of copyrighted and trademarked materials;

ii.    Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses and expert fees;

iii.    Issue an injunction prohibiting Defendants from continuing to interfere with

Plaintiffs' ownership of, and all other rights related to, SI and to cease infringement of Plaintiffs' trademark- and copyright-protected assets, and requiring Defendants to effectuate the transfers of SI assets, including all SI Content, Licensee Created Content, and Consumer Data, to ABG-SI or Minute Media as licensee.

iv.    Award pre- and post-judgment interest; and

v.     Grant all such other and further relief as it deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 4, 2025                                    Respectfully submitted,
       New York, New York

                                                        /s/ *Roberta A. Kaplan*
                                                        Roberta A. Kaplan
                                                        Timothy S. Martin
                                                        D. Brandon Trice
                                                        KAPLAN MARTIN LLP

                                                        1133 Avenue of the Americas
                                                        Suite 1500
                                                        New York, New York 10036
                                                        Tel.: (212) 316-9500
                                                        rkaplan@kaplanmartin.com
                                                        tmartin@kaplanmartin.com
                                                        btrice@kaplanmartin.com

                                                        *Counsel for Plaintiffs*